**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division**

_____

|  |  |  |
|---|---|---|
| **FG HEMISPHERE ASSOCIATES, LLC,** | ) | |
| **11 Broadway, Suite 615** | ) | |
| **New York, NY 10004** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | **Case No.** |
| **v.** | ) | |
| | ) | |
| **DEMOCRATIC REPUBLIC OF CONGO,** | ) | |
| **Ministere des Aff aires Etrangeres** | ) | |
| **Place de I'Independence** | ) | |
| **Boite Postale 7100** | ) | |
| **Kinshasa-Gombe** | ) | |
| **Republique Democratique du Congo** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **SOCIETE NATIONALE D'ELECTRICITE,** | ) | **The Honorable Peter J. Messitte** |
| **2831 Avenue de la Justice** | ) | |
| **Boite Postale 500** | ) | |
| **Kinshasa-Gombe** | ) | |
| **Republique Democratique du Congo** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **BALANNE FAMILY LIVING TRUST,** | ) | |
| **164 Winsome Circle** | ) | |
| **Bethesda, MD 20814** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **ANETH DORAH SF MTWALE,** | ) | |
| **19505 White Saddle Dr.** | ) | |
| **Germantown, MD 20874** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **SELEMANI FRANCIS MTWALE,** | ) | |
| **19505 White Saddle Dr.** | ) | |
| **Germantown, MD 20874** | ) | |
| | ) | |

| | |
|---|---|
| **and** | ) |
| | ) |
| **THE LAND KNOWN FOR ASSESSMENT** | ) |
| **AND TAXATION PURPOSES AS LOT 96** | ) |
| **PLAT 19998; LOT 133, PLAT 24987; LOT** | ) |
| **144 PLAT 2017-25020; AND LOT 54, PLAT** | ) |
| **24984** | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

## COMPLAINT

Plaintiff, FG Hemisphere Associates, LLC ("Plaintiff"), by its undersigned counsel, brings this ancillary relief proceeding pursuant to Fed. R. Civ. P. 64 and Md. Rule 2-651 for declaratory relief and imposition of a constructive trust on the real property at issue.

## NATURE OF THE ACTION

1.      Plaintiff brings this *in rem* action alleging that its outstanding and unpaid judgments against the Defendants Democratic Republic of Congo ("DRC") and Societe Nationale D'Electricite (collectively the "Judgment Debtors"), can and should be enforced through the seizure of four properties located in Montgomery County, Maryland (collectively the "Maryland Properties") purchased by and in the hands of Third-Party Garnishees Francis Selemani Mtwale ("Selemani") and his wife, Aneth Michael Lutale ("Lutale") through the US-registered Balanne Family Living Trust ("Balanne Trust") (collectively "Third-Party Garnishees" and together with the Judgment Debtors, "Defendants"), an entity they control, with funds embezzled from the DRC pursuant to a scheme intended to thwart the DRC's creditors.

2.      To that end, Plaintiff seeks ancillary relief pursuant to Fed. R. Civ. P. 64 and Rule 2-651 of the Maryland Rules of Civil Procedure, and imposition of a constructive trust over the Maryland Properties, immediately preserving the status quo and preventing their sale, dissipation, assignment and/or transfer in order to secure the outstanding judgments.

## PARTIES

3.      Plaintiff FG Hemisphere Associates, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 11 Broadway, Suite 615, New York, NY 10004. Plaintiff is managed by a New York-based corporation.  Accordingly, Plaintiff FG Hemisphere Associates, LLC is a citizen of the State of New York.  Neither Plaintiff FG Hemisphere Associates, LLC nor the corporation that manages it have any members who are aliens or citizens of Maryland.

4.      Defendant Democratic Republic of Congo is a foreign country and judgment debtor to Plaintiff pursuant to two judgments issued by the United States District Court for the District of Columbia.

5.      Defendant Societe Nationale D'Electricite is a foreign company located at 2831 Avenue de la Justice, Boite Postale 500, Kinshasa-Gombe, Republique Democratique du Congo. Defendant Societe Nationale D'Electricite is a judgment debtor to Plaintiff pursuant to two judgments issued by the United States District Court for the District of Columbia.

6.      Defendant Francis Selemani Mtwale resides in Maryland at 19505 White Saddle Dr., Germantown, MD 20874.  Selemani is the brother of former DRC President Joseph Kabila and is married to Defendant Aneth Michael Lutale.  Selemani is a citizen of the State of Maryland.

7.      Defendant Aneth Michael Lutale resides in Maryland at 19505 White Saddle Dr., Germantown, MD 20874.  Lutale is the wife of Defendant Francis Selemani Mtwale and is the trustee of the Balanne Family Living Trust.  Lutale is a citizen of the State of Maryland.

8.      Defendant Balanne Family Living Trust is a trust organized under the laws of Maryland, with its principal place of business located at 164 Winsome Circle, Bethesda, MD 20814.  Defendant Balanne Family Living Trust is (and since 2018 has been) the record owner of

all of the Maryland Properties, is controlled by Selemani and Lutale, and is listed in the property records as having multiple mailing addresses in the State of Maryland.  Lutale is the trustee of the Balanne Family Living Trust.

## JURISDICTION & VENUE

9.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1330(a), as Defendant DRC is a foreign state and is not entitled to immunity for the claims asserted herein under 28 U.S.C. §§ 1605-1607 or under any applicable international agreement.

10.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and there is complete diversity between the parties as the Defendants are all citizens of either Maryland or the DRC for jurisdictional purposes, and the Plaintiff is a New York-based LLC with no members who are aliens or citizens of Maryland.

11.     This Court has federal question jurisdiction pursuant to 9 U.S.C. § 203 because this action seeks enforcement of the foreign arbitral awards embodied in the judgements at issue as against the Maryland Properties.

12.     This Court has personal jurisdiction over the Defendants because the acts or omissions giving rise to Plaintiff's claims occurred in this district, and, upon information and belief, Defendants have property in this district subject to seizure and regularly conduct business in this district.

13.     This Court has *quasi in rem* jurisdiction over the Maryland Properties because Plaintiff, as a bona fide judgment creditor of the DRC, seeks to assert a pre-existing claim in the Maryland Properties and to extinguish or establish the nonexistence of similar interests of third parties.

14.    This Court has specific personal jurisdiction over Selemani, Lutale and the Balanne Trust because their acts or omissions which gave rise to Plaintiff's claims occurred in this district.  Specifically, the act of purchasing and maintaining title over the Maryland Properties belonging to the DRC, to which Plaintiff is entitled as a judgment creditor of DRC, gave rise to Plaintiff's claims.  Third-Party Garnishee Balanne Family Living Trust is (and since 2018 has been) the record owner of all of the Maryland Properties, and is listed in the property records as having several Maryland mailing addresses. Third-Party Garnishee Lutale signed the deeds for all of the Maryland Properties as trustee of the grantee Trust, and is likewise identified with several Maryland mailing addresses. Third-Party Garnishee Selemani was, with his wife Lutale, the direct record owner of one of the Maryland Properties from 2015 until such property was transferred by his wife to be held by the Trust in 2018.

15.    This Court has personal jurisdiction over the DRC pursuant to 28 U.S.C. § 1330(b) because the DRC is a foreign state and all claims asserted herein are within this Court's subject matter jurisdiction pursuant to 28 U.S.C. § 1330(a).

16.    This Court has ancillary enforcement jurisdiction in this post-judgment proceeding because Plaintiff is seeking to collect a federal court judgment and property of the Judgement Debtors is currently in the hands of the Third-Party Garnishees.

17.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the action relates to real property whose situs is in the County of Montgomery, State of Maryland, which is within this district.

## FACTUAL BACKGROUND

**I.     The Judgments**

18.     Plaintiff is the owner of the underlying arbitration awards, having purchased the rights and claims to these awards pursuant to an Assignment Agreement between Plaintiff (as purchaser) and Energoinvest DD (as seller), dated November 16, 2004.  *See* **Exhibit 1.**

19.     The arbitration awards have since been affirmed by the United States District Court, District of Columbia ("DC District Court").

20.     A final judgment was entered by the DC District Court on September 19, 2004, in favor of Plaintiff's predecessor-in-interest, Energoinvest DD, in the amount of $11,725,844.96, together with interest at the annual rate of 9% on the sum of $11,179,266.36, to be calculated based on the amount of each overdue installment included in said sum, starting on the respective due date and up to the date of full payment, plus interest at the annual rate of 5% on the sum of $546,578.60, starting on March 4, 2001 and up to the date of full payment, together with fees and costs (the "2004 Judgment").  *See* **Exhibit 2.**

21.     A second final judgment was entered by the DC District Court on January 31, 2005, in favor of the Plaintiff, in the amount of $18,430,555.47, together with interest at the annual rate of 8.75% on the sum of $18,073,746.94, to be calculated based on the amount of each overdue installment included in said sum, starting on the respective due date and up to the date of full payment, plus interest at the annual rate of 5% on the sum of $356,808.52, starting on March 4, 2001 and up to the date of full payment, together with fees and costs (the "2005 Judgment" and collectively with the 2004 Judgment, the "Judgments").  *See* **Exhibit 3.**

22.     On December 19, 2015, in the action captioned *FG Hemisphere v. Democratic Republic* of Congo, and Societe Nationale D'Electricite, Nos. 03-1314, 03-1315, the United States

District Court for the District of Columbia issued an order reviving the Judgments. *See* **Exhibit 4.**

23.     On December 2, 2021, Plaintiff registered the Judgments with this Court (Dkt. 1 in Case No. 8:21-mc-00720, and Dkt. 1 in Case No. 8:21-mc-00721). *See* **Exhibit 5.**

24.     On December 14, 2021, Plaintiffs filed a Writ of Execution with respect to the property Known for Assessment and Taxation Purposes as Lot 96, Plat 19998, located in Montgomery County, Maryland, with the Clerk of the United States District Court for the District of Maryland (Dkt. 8 in Case No. 8:21-mc-00721). *See* **Exhibit 6.**

25.     On December 14, 2021, Plaintiffs filed a Writ of Execution with respect to the property Known for Assessment and Taxation Purposes as Lot 133, Plat 24987, located in Montgomery County, Maryland, with the Clerk of the United States District Court for the District of Maryland (Dkt. 8 in Case No. 8:21-mc-00721). *See id.*

26.     On December 14, 2021, Plaintiffs filed a Writ of Execution with respect to the property Known for Assessment and Taxation Purposes as Lot 144, Plat 2017-25020, located in Montgomery County, Maryland, with the Clerk of the United States District Court for the District of Maryland (Dkt. 8 in Case No. 8:21-mc-00721). *See id.*

27.     On December 14, 2021, Plaintiffs filed a Writ of Execution with respect to the property Known for Assessment and Taxation Purposes as Lot 54, Plat 24984, located in Montgomery County, Maryland,  with the Clerk of the United States District Court for the District of Maryland (Dkt. 8 in Case No. 8:21-mc-00721). *See id.*

28.     On December 20, 2021, the writs were returned executed (Dkt. 9 in Case No. 8:21-mc-00721). *See* **Exhibit 7.**

29.    As a result of the arbitration awards and orders of the DC District Court, it is irrefutable that Plaintiff owns two final, enforceable Judgments against the Judgment Debtors.

30.    The DRC has gone to considerable lengths to undermine Plaintiff's attempts at enforcement, including refusing to comply with court-ordered discovery in aid of execution of the Judgments in an effort to hide assets, which resulted in a 2009 Order of contempt issued by the DC District Court.  *See* **Exhibit 8.**

31.    Plaintiff has made numerous attempts to settle the Judgments amicably.  Senior DRC officials have been unwilling to do so absent a condition that Plaintiff engage in bribery. Plaintiff refused to engage in such conduct, making settlement impossible.

32.    To date, the DRC has not satisfied its debt obligation pursuant to the Judgments.

## II.    **Plaintiff's Investigation**

33.    As a result of the DRC's efforts to thwart enforcement and unwillingness to enter into a lawful settlement, Plaintiff has engaged in a 16-year global investigation to expose systemic corruption within the DRC.  As part of this investigation, Plaintiff extensively traced the DRC's assets in an effort to enforce the Judgments, spending countless hours compiling and analyzing information from former DRC officials, official government documents and investigators across the world.

34.    Given the Judgment Debtors' use of correspondent accounts with clearing banks in the United States for monetary transfers, Plaintiff propounded multiple rounds of discovery requests on various financial institutions in an attempt to collect on the Judgments, including Citibank.  *See* **Exhibit 9**.  These subpoenas sought wire transfer records for entities and individuals connected to the fraudulent scheme, processed by each bank as a payor/transferor, payee/transferee, intermediary or correspondent bank.  The documents produced by these financial

institutions in response to the subpoenas included financial records maintained in the ordinary course of business, including bank wires. *See infra* at ¶¶51-62.

35.     A review of the financial records produced in response to these subpoenas, in conjunction with the aforementioned investigative efforts, brought into focus the sprawling conspiracy (the "DRC Embezzlement Enterprise") outlined in detail below.  This conspiracy was sanctioned and approved at the highest level of the DRC government, involving Joseph Kabila ("Kabila"), the former President of the DRC, a number of his family members including his brother Selemani, his sister in law Lutale, his sister Gloria Mteyu, close associates, senior DRC government officials—as well as certain companies and banks operating within the DRC—to misappropriate billions of dollars for their own personal benefit.

**III.     The DRC Embezzlement Enterprise**

36.     The DRC Embezzlement Enterprise includes multiple schemes orchestrated worldwide and authorized by the then DRC president Kabila, who was in power from 2001 through 2019.

**A.     Och Ziff**

**37.**     Various criminal investigations in the United States and United Kingdom substantiate key elements of the DRC Embezzlement Enterprise.  In 2016, a subsidiary of a New York-based investment fund then known as Och-Ziff Capital Management Group, LLC ("Och-Ziff") plead guilty to a conspiracy to violate the Foreign Corrupt Practices Act in relation to Och-Ziff's dealings in the DRC.  The statement of facts from that criminal prosecution shows that Och-Ziff's co-conspirator, Dan Gertler ("Gertler") paid tens of millions of dollars in bribes to Kabila and his now-deceased chief advisor Augustin Katumba Mwanke ("Katumba"), along with the DRC attorney general and several justices of the DRC Supreme Court.  This was done to secure

privileged access to DRC mineral assets for a fraction of their true market value, including having mineral rights previously awarded to another company stripped through the corruption of the DRC courts.  *See* **Exhibit 10.**

      **B.**    **Swiss Proceedings**

     38.    Och-Ziff is far from the only one who conspired with Gertler, Kabila and Katumba to secure and maintain privileged access to DRC state assets—primarily mineral rights—through the payments of bribes and the ongoing payment of kickbacks of revenues derived from these mineral rights.  A recent judgment of Switzerland's federal appeals court (the "Swiss Judgment") quotes extensively from affidavit evidence and primary documentation obtained by the UK's Serious Fraud Office (the "SFO") during the SFO's own investigation into part of the DRC Embezzlement Enterprise.  *See* **Exhibits 11 and 12.**

     39.    The Swiss Judgment is the result of an unsuccessful challenge brought by an unidentified company whose Swiss bank records were sought during the SFO's investigation.  The Swiss Judgment, referencing the affidavits and primary documentation, describes a portion of a larger, sophisticated professional money laundering organization ("PMLO"), which forms part of the DRC Embezzlement Enterprise.  Between the years 2006 and 2011 (the time frame covered by the affidavit evidence—the scheme continued after that), Gertler "borrowed" $360,292,535 in cash from the PMLO in the DRC.  Gertler then used this cash to pay bribes to Katumba, who is described as Kabila's "*bras droit*" or "right arm", and other DRC government officials to secure and maintain access to DRC mining assets.  Gertler would then "repay" these loans by causing his lawyers to wire funds to the Swiss bank accounts of other entities forming part of the PMLO.  *See* **Exhibit 13 & 14.**

     40.    Och-Ziff was just part of Gertler's broader scheme to obtain assets through

corruption, and Gertler is just part of an even broader system of bribery, money laundering and embezzlement which extends far beyond the mining sector.  For instance, numerous international companies with interests in the DRC have been making many hundreds of millions of dollars of payments to this same PMLO.  That is, the broader DRC Embezzlement Enterprise is an expansive, international criminal conspiracy, through which senior DRC officials and their co-conspirators have embezzled countless DRC assets.

41.     The part of the enterprise sited in the United States and thus, directly implicated in the present proceedings, is but a small subset of the larger whole scheme.  While a large portion of the embezzled funds has been laundered outside of the United States, or has been otherwise dissipated, millions of dollars of property is located in the United States, nearly all of which is directly traceable to these embezzled funds.

### C.     BGFIBank RDC S.A.

42.     The discovery obtained by Plaintiff revealed the use of BGFIBank RDC S.A. ("BGFI DRC") bank accounts by members of the Kabila family, its inner circle and the DRC government, to effectuate dissipation of DRC governmental assets to accounts controlled by the Kabila family, and the collection of payments to the Kabila family made by companies with business interests in the DRC.

43.     Plaintiff's investigation has been corroborated and expanded upon by a leak of 3.5 million documents from BGFI DRC, which is the basis of numerous investigative reports published by an international consortium of investigative journalists and non-governmental organizations known as "the Congo Hold-Up Consortium".

44.     The Congo Research Group ("CRG"), an independent organization based at the Center on International Cooperation at New York University ("CIC NYU"), has meticulously

documented family ties to Kabila and the DRC Embezzlement Enterprise with academic precision ("CRG Report").  *See* **Exhibit 15.**  The CRG Report highlights the role of the Kabila family in numerous Kabila-controlled entities.  For instance, family members often use assumed names, which are frequently versions of one of Kabila's pseudonyms, Francis Mtwale.  *See id.* at pp. 11, 13, 26, 30, 35, 37 & 40.

45.     Plaintiff's investigation is corroborated by the findings of accredited academics and researchers at CIC NYU, and shows that people who grew up with Kabila now hold key positions or ownership interests in various organizations, such as a Congolese company, Sud Oil Sprl ("Sud Oil"), Kwanza Capital, and Sezo International, all of which serve as conduits of laundered money between the USA and DRC.  *Id.* at pp. 10, 37 & 40; *see also* Sud Oil's corporate minutes, attached hereto as **Exhibit 16** at p. 1; Sezo International Articles, attached hereto as **Exhibit 17** at p. 1; and a list of Kwanza Capital shareholders, attached hereto as **Exhibit 18**, at p. 1.  The nesting doll style of corruption is evidenced by the fact that Kwanza Capital is 20% owned by Sud Oil (20% of which is owned by Gloria Mteyu—Kabila's sister—and the other 80% of which is owned by Lutale).  *See* **Exhibit 16** (Sud Oil corporate minutes) at p. 1.

46.     The Sud Oil BGFI Account itself is controlled by Kabila's closest associates.  Selemani, Kabila's brother, served as Managing Director of BGFI DRC from 2010 until 2018.  *See* **Exhibit 19.**  During that same period, Kabila's sister, Gloria Mteyu, owned 40% of BGFI DRC.  *See* **Exhibit 20**.

47.     The documentation obtained and the analysis performed by the Congo Hold-up Consortium has greatly advanced Plaintiff's ability to fully trace DRC funds.  The Congo Hold-up Consortium has identified $138m of DRC embezzled funds siphoned off through BGFI DRC.  The bulk of these DRC embezzled funds were diverted into the BGFI DRC account of Sud Oil.

*See* **Exhibit 21**.  The leaked records show that the DRC Central Bank itself sent $94.5 million to the BGFI DRC accounts of entities connected to the Kabila family, including Sud Oil.  *See* **Exhibit 22**.

48.    The Sud Oil BGFI Account, bearing account number XXXXXXXX14-36 ("Sud Oil BGFI Account"), *see* **Exhibit 23** (Sud Oil BGFI bank records), has been used in numerous suspicious transactions and BGFI DRC's own business records, documented within an internal audit report, uncovered several red flags for money laundering: a) explanations for transfers were inconsistent; b) some of Sud Oil's transfers lacked justification; and c) compliance officials were restricted from reviewing some of the transfers.  *See* **Exhibit 19** at pp. 3 n. 4, 16 n. 103.

49.    An analysis of these bank records revealed that Sud Oil received at least $14.3 million in funds from a range of Congolese government institutions, including the Central Bank of Congo, and the DRC Mission.[1]  *See id.* at p. 3.

**D.    UN Transfers to the DRC Mission**

50.    Prior to the publication of the Congo Hold-Up Consortium's report, Plaintiff identified millions of dollars in embezzled funds originating with the DRC government, including funds purloined from the DRC Central Bank and the DRC Permanent Mission to the United Nations ("DRC Mission"), as well as at least $25 million in apparent bribe payments flowing into accounts at BGFI DRC controlled by Kabila family members and their associates.

51.    In response to one of Plaintiff's above-referenced subpoenas, Citibank produced documentation showing all incoming and outgoing wires going to and from the DRC Mission

---

[1] The Sud Oil bank account records obtained by Plaintiff only reflect transactions through July 18, 2016. The records obtained by the Congo Hold-up Consortium post-date these records and show that Sud Oil received "at least $85 million in funds from a range of Congolese government institutions, including the Central Bank of Congo, the DRC's permanent mission to the United Nations in New York, the Congolese state-owned mining company Gécamines, and the country's electoral commission." *See* Exhibit 19 at p. 5.

Citibank Account. The records obtained from Citibank begin in December 2011. Between December 2011 and March 2015, the DRC Mission Citibank Account only received a handful of *de minimis* wire transfers from the UN. On February 19, 2014, the Citibank Account received $7,204.40 from the UN, and on October 20, 2014, the account received $8,987.00 from the UN. **Exhibit 24** at pp. 67 & 85. Beginning in March 2015 and continuing until at least March 2017, however, the UN began making periodic, large wire transfers to the DRC Mission Citibank Account, which received a total of $25,073,093.06 from the UN during that time.

52. Although the wires from the UN to the DRC Mission Citibank Account do not indicate a purpose, onward transfers of these funds describe them as, inter alia, "TRANSFER OF THE REIMBURSEMENT FUNDS FROM UN IN FAVOR OF THE D.R. CONGO TREASURY", "REIMBURSEMENT UN FUNDS - D.R CONGO", and "FONDS DRC PEACEKEEPING". *See* **Exhibit 25** at pp. 2, 4-5. The DRC subsequently confirmed that these were payments reimbursing the DRC for the participation of its armed forces in the UN's peacekeeping mission in Central Africa Republic. *See* Exhibit 19 at p. 17.

53. In total, the DRC Mission Citibank and DRC Mission United Nations Federal Credit Union ("UNFCU") Accounts received thirteen wires from the UN between 2015 and 2019. The following table contains a summary of those wires. Plaintiff has grouped the wires from the UN into tranches based on how the proceeds of those wires were later distributed.

| Date | UN Wire Amount | DRC Mission Account | Description | Quantum of Tranche |
|---|---|---|---|---|
| 3/4/15 | $263,736.00 | Citibank | | |
| 3/4/15 | $1,707,624.00 | Citibank | | |
| 3/19/15 | $3,845,484.00 | Citibank | | |
| 6/18/15 | $3,804,192.00 | Citibank | | |
| 9/17/15 | $490,176.00 | Citibank | | |
| 9/18/15 | $3,280,716.00 | Citibank | First Tranche | $13,391,928.00 |
| 12/10/15 | $3,734,523.00 | Citibank | Second Tranche | |

| 3/16/16 | $3,601,126.00 | Citibank | | | $7,335,649.00 |
| 6/15/16 | $717,132.00 | Citibank, then UNFCU | | | |
| 12/12/16 | $388,171.50 | Citibank, then UNFCU | Third Tranche | $1,105,303.50 |
| 3/20/17 | $3,240,212.56 | Citibank, then UNFCU | Fourth Tranche | $3,240,212.56 |
| 6/18/18 | $240,595.92 | UNFCU | Fifth Tranche | $240,595.92 |
| 4/12/19 | $452,528.66 | UNFCU | Sixth Tranche | $452,528.66 |
| | | | TOTAL: | $25,766,217.64 |

54.    Of the $25,766,217.64 deposited by the UN into the DRC Mission Citibank and

UNFCU Accounts, $12,172,354.00 is known to have been embezzled by the DRC Embezzlement

Enterprise, as detailed below, and the fate of roughly $13 million is unknown.

| Description | Amount |
| --- | --- |
| Transferred to Sud Oil (wire fraudulently noted the beneficiary as the DRC Central Bank) | $ 6,809,854.00 |
| Transferred to personal accounts of DRC Head of UN Mission | $ 2,620,000.00 |
| Transferred to personal accounts of other DRC officials (known) | $ 2,292,500.00 |
| Transferred to personal accounts of other DRC officials (inferred) | $ 450,000.00 |
| TOTAL | $ 12,172,354.00 |

55.    For reasons set forth below at ¶¶ 56-62, the other roughly $13 million very well

also may have been lost to the DRC Embezzlement Enterprise.  The specific bank account to which

the bulk of those funds ($13,391,928.00) was wired is associated with the disappearance of other

DRC funds, and the holder of that account (the DRC Central Bank) contemporaneously made

substantial payments to companies close to Kabila that form part of the DRC Embezzlement

Enterprise.

i.      *First Tranche*

56.     Between March 2015 and mid-September 2015, the DRC Mission Citibank Account received $13,391,928 in six wire transfers from the UN.  *See* **Exhibit 26** at pp. 5-6, 8-9, and 12-13.  On October 28, 2015, the DRC Mission transferred this exact amount from its Citibank Account to account number 02-69 USD held by the DRC Central Bank at Rawbank ("DRC Central Bank Rawbank Account"), a bank based in the DRC.  *See* **Exhibit 25** at p. 2.  These funds did not benefit the DRC Central Bank, but rather the DRC Embezzlement Enterprise.

57.     The DRC Central Bank Rawbank Account has been used in another embezzlement scheme contemporaneous with the transfer of the First Tranche.  The DRC Central Bank Rawbank Account received at least two so-called payments of "Gecamines Tax Advances."  Letters from Gecamines directing its bank to make tax advance payments to the DRC Central Bank Rawbank Account.  *See* **Exhibit 27**.  Gecamines is a mining company wholly owned by the DRC.  Gecamines has not made a profit in decades and has no tax obligations, nor is it likely to in the foreseeable future.  These and other "tax advance" payments made by Gecamines to the DRC Central Bank, which total hundreds of millions of dollars, do not appear on contemporaneous DRC Central Bank accounting records.  Rather, the line item for Gecamines' tax payments is zero.  *See* **Exhibit 28**.  DRC Central Bank records showing, inter alia, that Gecamines made no tax payments between 2003-2016.  These records contain a heading "*autres recettes fiscales*", or in English, "other tax receipts".  Item (e) under this heading is labeled Gecamines.  These records cover the years 2003-2016 and show that Gecamines paid no tax during this period.

58.     This particular scheme of embezzling DRC funds by disguising the payments as "tax advances", has been reported by The New York Times:

> The most suspicious documents to emerge recently include a string
> of bank transfers to different accounts at different banks with the

notation that they were "advance tax payments" from Gécamines, a struggling state-controlled mining company, for Congo's central bank. Starting late last year, the transfers reveal anomalies like instructions that $8 million be withdrawn from the teller — in cash — on behalf of the central bank.

"That makes no sense," said a former employee of Congo's central bank who spoke on the condition of anonymity, saying he could be killed if he was identified. "We don't get cash from a commercial bank. We import our own cash. We have a service in Switzerland that does that."

Analysts at the Sentry, an investigative arm of the Enough Project, said that during the time of the supposed Gécamines transfer of $95.7 million to the central bank, the central bank's foreign reserves actually dropped — to $1.17 billion from $1.47 billion — pushing up inflation and causing issues for Congo's economy. At the same time, Mr. Kabila's government drastically cut spending on health care and the few services it provides.

Sentry analysts said they were curious how Gécamines, a company with endless management problems, would have that much cash on hand for advance tax payments when thousands of employees had not been paid in months. Documents showed that Gécamines lost $82.9 million in 2014. Mining executives said bigger, more profitable companies always paid much less in advance taxes.

*See* **Exhibit 29**.

ii.    *Second Tranche*

59.    In addition to the DRC Central Bank Rawbank Account being associated with other vanishing DRC funds, the DRC Central Bank has also transferred tens of millions of dollars to companies owned and controlled by Kabila's closest associates and family members.  *See* **Exhibit 30**.  In addition, bank records show that Sud Oil received $7,500,000 from the DRC Central Bank just months after the DRC Mission wired $13,391,928 to DRC Central Bank Rawbank Account. *See* **Exhibit 23** at p. 4.

60.    In December 2015 and March 2016, the UN made two more wire transfers to the DRC Mission Citibank Account, totaling $7,335,649.00.  *See id.*

61.     The following transaction between a Kabila controlled entity and entities controlled by the recipients of embezzled funds is emblematic of the red-flagged, papered over transactions Kabila's inner circle used their positions of power to effectuate (*i.e.*, blatant money laundering): on April 29, 2016, the DRC Mission wired $6,809,899 of the $7,335,649 from its Citibank Account, to a purported DRC Central Bank account held at BGFI DRC. *See* **Exhibit 25** at p. 1. The outgoing wire information from Citibank abbreviates the originator of the wire, i.e., the DRC Mission, as "PERM. MISSION OF REP OF C". Plaintiff has reviewed thousands of wire transfers to and from the DRC Central Bank, but the DRC Central Bank account number for its purported account at BGFI DRC contained in the wire does not appear in any other wire transfers. This wire contained fraudulent beneficiary and account information designed to induce Citibank to wire the funds to BGFI DRC where they could be embezzled by members of Kabila's family and his closest associates.

62.     Records from BGFI DRC show that BGFI DRC did not credit these funds to the DRC Central Bank's purported account, but rather, on May 16, 2016, BGFI DRC credited $6,809,854.00 (the quantum of the wire originating with DRC Mission Citibank Account minus an apparent $45 fee) to the Sud Oil BGFI Account. *See* **Exhibit 23** at p. 3-4. The Sud Oil BGFI Account records show the originator of the funds deposited by BGFI DRC into the Sud Oil BGFI Account as "PERM. MISSION OF REP OF C" (the exact same abbreviation used in the Citibank outgoing wire records). *See* **Exhibit 23** at p. 4. On the same day, BGFI DRC also credited Sud Oil's account with another $7.5 million, originating with the DRC Central Bank, meaning Sud Oil received $14.3 million of DRC government funds on one day alone, shortly after which Selemani and Lutale began acquiring real estate worth several million dollars, including the Maryland Properties.

IV.   **Purchase of Maryland Properties**

63.     Plaintiff's investigation revealed that Selemani and Lutale were the beneficiaries of millions of dollars of embezzled DRC government funds, which they used for their own personal benefit, including to purchase the Maryland Properties.

64.     BGFI DRC records show that Sud Oil—80% owned by Lutale—sent more than $12 million to accounts and companies linked to and controlled by Selemani and Lutale between 2015 and 2018.  *See* **Exhibit 19** at p. 13:[2]

   a.  in June 2016, Sud Oil sent $300,000 to Selemani's US based bank account;

   b.  in July 2016—**two months after receiving the May 16, 2016 transfers from the DRC Mission and DRC Central Bank**—Sud Oil sent $7.4 million to DRC-based investment firm Ascend Trust, which is owned by Selemani and Lutale.   The records reflect that the purpose of the transfer was to facilitate real estate purchases;

   c.  in April 2017, Sud Oil sent $1 million to Ascend Trust;

   d.  in February 2017, Sud Oil sent another $1 million to Ascend Trust;

   e.  in June 2017, Sud Oil sent two identical $1.12 million transfers labeled "investment funds" to a South Africa-registered company Garvelli controlled by Selemani and Lutale.

65.     Selemani—the managing director of BGFI DRC at this time—also wired money between 2015 and 2018 from accounts at BGFI DRC to his own foreign bank accounts, as well as to accounts in the United States and South Africa for the Balanne Trust and Garvelli.  **Exhibit 19** at pp. 6 n. 30, 7 & 13:

---

[2] The information cited from the report entitled *Embezzled Empire: How Kabila's Brother Stashed Millions in Overseas Properties*, THE SENTRY, November 2021, and the corresponding U.S. bank records referenced therein will be obtained and authenticated through discovery in this action.

a.  in May 2015 Selemani's US bank account received $300,000 from an internal BGFI DRC account;

b.  in June 2015 Selemani's US bank account received $540,000 from an internal BGFI DRC account;

c.  in August 2015 Selemani's US bank account received $150,000 from an internal BGFI DRC account;

d.  in September 2018, Selemani sent €1.1 million to the Balanne Trust.

66.  Both the Balanne Trust and Garvelli were used by Selemani and Lutale to purchase millions of dollars in foreign real estate, 17 properties in total for $6.6 million, including the four in Maryland at issue in this matter.

67.  The first property purchased in Maryland by Selemani and Lutale on April 10, 2015 for approximately $670,000 was a single-family four-bedroom row house in Rockville, Maryland. The deed indicates that the property served as Selemani's primary residence.  *See* **Exhibit 18** at p. 8; *see also* **Exhibit 31**.

68.  Bank transfer documentation shows that around the time of the transaction, Selemani sent nearly $1 million to a United States account held in his name at SunTrust bank for the stated purpose of buying and developing properties.  *See* **Exhibit 19** at p. 8.  The SWIFT transactions were labeled "acquisition immo," an abbreviation for "property purchase," and "frais amenagement immobilier," a reference to property development.

69.  A comparison of SWIFT messages and transaction records for both the internal bank account held by BGFI DRC and Selemani's personal BGFI DRC account revealed that he funds transferred to Selemani's US bank account had no corresponding debit on Selemani's personal BGFI DRC account, meaning that the internal bank account held by BGFI DRC—rather

than Selemani himself—wired the funds to his US bank account.   The internal bank account transferred the funds to a BGFI DRC correspondent account for the indicated purpose of "FRAIS CORRPMT TRAITE," an abbreviation for correspondent fees processed.

70.   On April 17, 2018, Lutale transferred the first property to the Balanne Trust.   *See* **Exhibit 18** at pp. 10 & 26.   Lutale served as trustee of Balanne Trust and uses her married name of Aneth Dorah SF Mtwale or Aneth D. SF Mtwale when she stated her capacity as Trustee on the four deeds for the Maryland Properties.

71.   In 2018, Selemani and Lutale used the Balanne Trust for millions of dollars in real estate acquisitions.   All four of Selemani's US properties (in Maryland) and one of his South African properties are owned through trusts.   *See* **Exhibit 19**, Maryland State Archives, "Deed," Book 55925, pp. 328-331, available at: https://mdlandrec.net/main/dsp_search.cfm; **Exhibit 19**, p. 10 at n. 61, Maryland State Archives, "Deed," Book 56112, pp. 124-131, available at: https://mdlandrec.net/main/dsp_search.cfm; **Exhibit 19**, p. 10 at n. 61, Maryland State Archives, "Deed," Book 57085, pp. 367-374, available at: https://mdlandrec.net/main/dsp_search.cfm; and **Exhibit 19**, p. 10 at n. 61, Maryland State Archives, "Deed," Book 56130, pp. 1-8, available at: https://mdlandrec.net/main/dsp_search.cfm.

72.   On May 15, 2018, Selemani and Lutale purchased a three-bedroom, four-floor luxury townhouse in Bethesda, Maryland through the Balanne Trust for approximately $1,224,999. *See* **Exhibit 19** at p. 26 n. 147 and **Exhibit 32**.

73.   In late August-September 2018, Selemani wired 1.1 million Euro to the Balanne Trust, *supra* at ¶66(d).

74.   On December 18, 2018, Selemani and Lutale purchased a three-bedroom luxury townhouse in Bethesda, Maryland through the Balanne Trust for approximately $884,720.   *See*

**Exhibit 19** at p. 26 n. 148 and **Exhibit 33**.

75.     On December 18, 2018, Selemani and Lutale purchased a three-bedroom luxury townhouse in Bethesda, Maryland through the Balanne Trust for approximately $1,377,237.  *See* **Exhibit 19** at p. 26 n. 149 and **Exhibit 34**.

76.     All four Properties are located in Montgomery County, Maryland, one of the country's most expensive real estate markets.  Three of the four properties are new luxury townhouses in a neighborhood where median house prices exceed $1 million.  These properties include two newly built four-story luxury townhouses with personal elevators and full-level rooftop terraces.  Address records and rental websites suggest that three of the Properties have been leased, providing him a lucrative source of additional income.  *Se*e **Exhibit 19** at p. 10.

77.     Because the acquisition of the Maryland Properties were all-cash transactions, Selemani and Lutale were able to avoid the standard due diligence performed in connection with bank financing which would have red-flagged the source of their wealth—embezzled DRC funds.

78.     Plaintiff has been deprived of substantial amounts of interest and access to its property since the Judgments have been issued.

79.     The Judgment Debtors have given no indication that they intend to facilitate the transfer of property to satisfy the Judgments.

80.     The Maryland Properties are subject to seizure to satisfy the outstanding and unpaid Judgments against the DRC because they were bought with embezzled DRC funds and are the property of the DRC.

**FIRST CAUSE OF ACTION**
**(Ancillary Relief in Aid of Enforcement)**

81.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 80 as if fully set forth herein.

82.     Rule 2-651 provides in pertinent part that "Upon motion and proof of service, a court in which a judgment has been entered or recorded may order such relief regarding property subject to enforcement of the judgment as may be deemed necessary and appropriate to aid enforcement of the judgment pursuant to these rules."  Plaintiff so moves here.

83.     Plaintiff holds two final, enforceable Judgments issued by the United States District Court, District of Columbia against the Judgment Debtors, the principal amount of which exceeds $30 million, plus accruing interest.

84.     The Judgment Debtors have failed to satisfy the Judgments.

85.     The Maryland Properties were purchased with embezzled funds of, and are the property of the DRC, but are in the control, custody and possession of the Third-Party Garnishees.

86.     The fair market value of the Maryland Properties should be used to partially secure the Judgments.

87.     Rule 2-651 gives the Court the power to award this ancillary relief.

### SECOND CAUSE OF ACTION
### (Constructive Trust)

88.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 87 as if fully set forth herein.

89.     The Third-Party Garnishees received the benefit of funds embezzled from the DRC which were used to purchase the Maryland Properties and allowing them to retain the benefit of the Maryland Properties without providing Plaintiff with their fair market value to secure the Judgments would be unjust and inequitable.

90.     Third-Party Garnishees used money embezzled from the DRC (which was susceptible to seizure in satisfaction of the Judgments) to purchase the Maryland Properties in the name of an entity under their control, the Balanne Trust.

91.     The Maryland Properties were acquired under circumstances that render it inequitable for the Third-Party Garnishees holding the title to retain it.

92.     A constructive trust must be imposed to prevent the unjust enrichment of the Third-Party Garnishees at the expense of Plaintiff.

**THIRD CAUSE OF ACTION**
**(Declaratory Relief)**

93.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 92 as if fully set forth herein.

94.     This action is necessary to resolve a bona fide dispute between Plaintiff and Defendants as to whether the Maryland Properties were purchased with funds embezzled from and are the property of the DRC.

95.     There is an actual case in controversy between Plaintiff and the Judgment Debtors regarding more than $30 million, plus accruing interest owed to Plaintiff pursuant to two final, enforceable Judgments issued by the United States District Court, District of Columbia against the Judgment Debtors.

96.     As of this filing the Third-Party Garnishees are in the possession of the Maryland Properties the value of which should be used to partially secure the Judgments.

97.     There is doubt as to any potential rights of the Third-Party Garnishees with regard to the Maryland Properties.

98.     Plaintiff believes the Maryland Properties were purchased using funds of the DRC which could be used to secure the Judgments and where the circumstances render it inequitable for the Third-Party Garnishees who hold title to retain them.

99.     Plaintiff is entitled to have any doubts resolved regarding the rights the Defendants have with regard to the Maryland Properties.

100.     Granting declaratory relief would dispose of the controversy between the Plaintiff and Defendants.

101.     The controversy between the parties is not hypothetical, abstract, or academic, but is definite and concrete, with sufficient immediacy as to justify relief.

102.     All conditions precedent to the filing of this action have occurred, been performed or have been waived.

103.     Plaintiff seeks a judicial determination which will immediately preserve the status quo and prevent the sale, dissipation, assignment and/or transfer of the Maryland Properties.  A judicial declaration is necessary and appropriate and in the interest of judicial economy in order for Plaintiff to partially secure the outstanding Judgments.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests:

    a.   A judicial declaration which will immediately preserve the status quo and prevent the sale, dissipation, assignment and/or transfer of the Maryland Properties in order for Plaintiff to partially secure the outstanding Judgments.

    b.   Imposition of a constructive trust on the Maryland Properties; and

    c.   For such other and further relief as this Court may deem just and equitable.

Dated: September 16, 2022

FG HEMISPHERE ASSOCIATES, LLC,

By its attorneys,

/s/ Philip T. Evans
Philip T. Evans (Bar No. 11796)
Benjamin A. Genn (Bar No. 21070)
HOLLAND & KNIGHT LLP
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Telephone: (202) 955-3000
Email: Philip.Evans@hklaw.com
Email: Benjamin.Genn@hklaw.com
*Counsel for Plaintiff*

Warren E. Gluck (*pro hac vice forthcoming*)
Matthew R. DiBlasi (*pro hac vice forthcoming*)
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Telephone: (212) 513-3494
Email: warren.gluck@hklaw.com
Email: matthew.diblasi@hklaw.com
*Counsel for Plaintiff*