## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Greenbelt Division

---

|  |  |  |
|---|---|---|
| **FG HEMISPHERE ASSOCIATES, LLC,** | ) | |
| | ) | |
| *Plaintiff,* | ) | REDACTED |
| | ) | |
| | ) | **Case No.**  8:22-CV-02369 |
| **v.** | ) | |
| | ) | |
| **DEMOCRATIC REPUBLIC OF CONGO,** | ) | **The Honorable Peter J. Messitte** |
| **SOCIETE NATIONALE D'ELECTRICITE,** | ) | |
| **BALANNE FAMILY LIVING TRUST,** | ) | |
| **ANETH DORAH SF MTWALE,** | ) | |
| **SELEMANI FRANCIS MTWALE, AND** | ) | |
| **THE LAND KNOWN FOR ASSESSMENT** | ) | |
| **AND TAXATION PURPOSES AS LOT 96** | ) | |
| **PLAT 19998; LOT 133, PLAT 24987; LOT** | ) | |
| **144 PLAT 2017-25020; AND LOT 54, PLAT** | ) | |
| **24984** | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

---

### DECLARATION OF PETER GROSSMAN IN SUPPORT
### OF PLAINTIFF FG HEMISPHERE ASSOCIATES LLC'S
### MOTION FOR WRIT OF ATTACHMENT BEFORE JUDGMENT

**PETER GROSSMAN** solemnly affirms under the penalty of perjury that the contents of

this declaration are true and correct to the best of my knowledge, information, and belief:

1.      I am the Managing Director and co-founder of FG Capital Management, Ltd., an

investment management firm that invests in and manages assets in special and distressed situations

with a focus on emerging markets.  FG Capital Management, Ltd. is based in New York City and

manages plaintiff FG Hemisphere Associates, LLC ("Plaintiff"), a Delaware investment holding

company.  I am familiar with the facts and circumstances underlying this dispute.

2.      I am proficient in French and I am an attorney admitted to practice in the State of

New York.  I practiced law from 1983 to 1987 until joining the emerging markets team at Shearson

Lehman Brothers where I was responsible for its structured transactions around the world.  In 1990, my group joined Morgan Stanley to establish its fixed income emerging markets unit.  In this role I was responsible for the group's specialized transactions and investments throughout Latin America.  In 1993, myself and others from Morgan Stanley formed Centaur International Corporation, which became FG Capital Management, Ltd. in 2000.

3.      As managing director and co-founder of FG Capital Management, Ltd. for nearly 30 years, I have designed and executed hundreds of international transactions in emerging markets and managed assets in a variety of litigation-based environments, including sovereign debt claims and other litigation-based claims.  As part of my practice I have also advised certain sovereign countries and assisted them on resolving their external debt claims, including managing debt repurchase programs.  My experience in advising sovereigns regarding their debt management has given me a unique perspective on countries facing debt problems.  There are certain countries that are unable to honor their contractual commitments due to exogenous shocks beyond their control, and there are others who largely chose not to do so – countries that are mismanaged and whose governments are endemically corrupt.  Often, such corruption is accompanied by the paradox of substantial natural resource wealth and glaring poverty.  I have extensive experience as well in advising companies that have ended up negatively impacted by such regimes.

4.      In the course of managing FG Capital Management, Ltd., I established FG Hemisphere Associates (*i.e.*, Plaintiff in this action), a special-purpose vehicle managed by FG Capital Management, Ltd., to purchase two defaulted, sovereign claims in the early 2000's, one of which remains extant and is the basis of the current action.  In both cases, the countries were incredibly wealthy in terms of natural resources, but too little of the revenue from these resources was ending up in the national treasury.  Plaintiff believed that the market had mispriced the debt

2

of these two countries by focusing on the governments' claimed revenue rather than the revenues that these natural resources should have been, and indeed were, generating. At their core, these countries were suffering from a lack of proper governance, not a lack of resources.

5.      Plaintiff's strategy in respect of such sovereign claims in part depends on asset tracing and on emphasizing governance and transparency reforms that will recapture this lost revenue for the public coffers. Plaintiff demands accountability from these governments. As a result of this work, Plaintiff has uncovered many multiples of what it has sought in settlement of its claims. Should governments choose to properly manage their resources, it will mean considerably more money for education, health care, and development programs, and for resolving their legal obligations fairly, responsibly and transparently.

6.      In the course of its anti-corruption work, Plaintiff has worked with, among others, donor governments and multilateral institutions to expose these lost revenues and to recommend policies that will help ensure that the abundant natural resource wealth of these countries benefits all citizens. This work has been, and will continue to be, instrumental to encouraging real, long term, sustainable development and better governance in such countries.

7.      I respectfully submit this declaration in support of Plaintiff's September 16, 2022 Request for Writ of Attachment Before Judgment on the four parcels of real property at issue in this case, located in Montgomery County, Maryland, which were purchased with funds of, and are the property of judgment debtor the Democratic Republic of Congo ("DRC"), but are in possession of third-party garnishees Francis Selemani Mtwale ("Selemani") and his wife, Aneth Michael Lutale ("Lutale") through the US-registered Balanne Family Living Trust ("Balanne Trust") (collectively "Third-Party Garnishees").

8.      The statements and information contained herein submitted in support of Plaintiff's

Motion for Writ of Attachment Before Judgment are based upon my personal knowledge, experience, analysis and review of documents relevant to this matter, and document corruption over an extended period that was coordinated by and between the highest levels of the DRC government, including its former President, and, inter alia, the Third-Party Garnishees.

## THE JUDGMENTS AND INVESTIGATION

9.      Plaintiff is the owner of the underlying arbitration awards, having purchased the rights and claims to these awards pursuant to an Assignment Agreement between Plaintiff (as purchaser) and Energoinvest DD (as seller), dated November 16, 2004.  Attached hereto as **Exhibit 1** are true and correct copies of the underlying arbitration awards in this case.

10.      The arbitration awards have since been affirmed by the United States District Court, District of Columbia ("DC District Court").

11.      A final judgment was entered by the DC District Court on September 19, 2004, in favor of Plaintiff's predecessor-in-interest, Energoinvest DD, in the amount of $11,725,844.96, together with interest at the annual rate of 9% on the sum of $11,179,266.36, to be calculated based on the amount of each overdue installment included in said sum, starting on the respective due date and up to the date of full payment, plus interest at the annual rate of 5% on the sum of $546,578.60, starting on March 4, 2001 and up to the date of full payment, together with fees and costs (the "2004 Judgment").  Attached hereto as **Exhibit 2** is a true and correct copy of the 2004 Judgment.

12.      A second final judgment was entered by the DC District Court on January 31, 2005, in favor of the Plaintiff, in the amount of $18,430,555.47, together with interest at the annual rate of 8.75% on the sum of $18,073,746.94, to be calculated based on the amount of each overdue installment included in said sum, starting on the respective due date and up to the date of full

payment, plus interest at the annual rate of 5% on the sum of $356,808.52, starting on March 4, 2001 and up to the date of full payment, together with fees and costs (the "2005 Judgment" and collectively with the 2004 Judgment, the "Judgments").  Attached hereto as **Exhibit 3** is a true and correct copy of the 2005 Judgment.

13.     On December 19, 2015, in the action captioned *FG Hemisphere v. Democratic Republic* of Congo, and Societe Nationale D'Electricite, Nos. 03-1314, 03-1315, the United States District Court for the District of Columbia issued an order reviving the Judgments.  Attached hereto as **Exhibit 4** is a true and correct copy of the DC District Court's Order reviving the Judgments.

14.     On December 2, 2021, Plaintiff registered the Judgments with this Court (Dkt. 1 in Case No. 8:21-mc-00720, and Dkt. 1 in Case No. 8:21-mc-00721).  Attached hereto as **Exhibit 5** is a true and correct copy of the registered Judgments.

15.     The DRC has gone to considerable lengths to undermine Plaintiff's attempts at enforcement, including submitting materially false testimony and evidence and refusing to comply with court-ordered discovery in aid of execution of the Judgments in an effort to hide assets, which resulted in a 2009 Order of contempt issued by the DC District Court.  Attached hereto as **Exhibit 6** is a true and correct copy of the DC District Court's 2009 Order of contempt.

16.     Plaintiff has made numerous attempts to settle the Judgments amicably.  Senior DRC officials have been unwilling to do so absent a condition that Plaintiff engage in bribery. Plaintiff refused to engage in such conduct, making settlement impossible.

17.     In an effort to enforce the Judgments, Plaintiff, under my direction, has engaged in a 16-year effort to extensively trace the DRC's assets.  As part of this effort, Plaintiff  conducted a global investigation to expose systemic corruption within the DRC.  Plaintiff has spent countless hours compiling and analyzing information from former DRC officials, official government

documents and investigators.

18.     As part of the asset tracing exercise, Plaintiff propounded multiple rounds of discovery requests on financial institutions in an attempt to collect on the Judgments, including Citibank.  Attached hereto as **Exhibit 7** is a true and correct copy of the subpoena served on Citibank.  These subpoenas sought wire transfer records for entities and individuals connected to the fraudulent scheme, processed by each bank as a payor/transferor, payee/transferee, intermediary or correspondent bank.

19.     FG Capital  then spent hundreds of hours reviewing the financial records produced in response to these subpoenas, which consisted of bank wires maintained in the ordinary course of business.[1]  These financial documents, in conjunction with the aforementioned investigative efforts, brought into focus the sprawling conspiracy (the "DRC Embezzlement Enterprise") outlined in detail below.  This conspiracy was sanctioned and approved at the highest level of the DRC government involving Joseph Kabila ("Kabila"), the former President of the DRC from 2001-2019, a number of his family members including his brother Selemani, his sister in law Lutale, his sister Gloria Mteyu, close associates, senior DRC government officials—as well as certain companies and banks operating within the DRC—to misappropriate billions of dollars for their own personal benefit.

## THE DRC EMBEZZLEMENT ENTERPRISE

20.     The DRC Embezzlement Enterprise includes multiple schemes orchestrated worldwide and authorized by the then DRC president Kabila.

21.     Various criminal investigations in the United States and United Kingdom

---

[1] The corresponding responsive document productions from Citibank is attached hereto and referenced below at ¶¶35-46.

substantiate key elements of the DRC Embezzlement Enterprise.  In 2016, a subsidiary of a New York-based investment fund then known as Och-Ziff Capital Management Group, LLC ("Och-Ziff") plead guilty to a conspiracy to violate the Foreign Corrupt Practices Act in relation to Och-Ziff's dealings in the DRC.  The statement of facts from that criminal prosecution shows that Och-Ziff's co-conspirator, Dan Gertler ("Gertler") paid tens of millions of dollars in bribes to Kabila and his now-deceased chief advisor Augustin Katumba Mwanke ("Katumba"), along with the DRC attorney general and several justices of the DRC Supreme Court.  This was done to secure privileged access to DRC mineral assets for a fraction of their true market value, including having mineral rights previously awarded to another company stripped through the corruption of the DRC courts.  Attached hereto as **Exhibit 8** is a true and correct copy of the guilty plea of an Och-Ziff subsidiary and the accompanying Statement of Facts.  Although the Statement of Facts refers to Gertler, Kabila and Katumba as, respectively, "DRC Partner", "DRC Official 1" and "DRC Official 2", they are easily identifiable through details contained in the Statement of Facts.

22.     Och-Ziff is far from the only one who conspired with Gertler, Kabila and Katumba to secure and maintain privileged access to DRC state assets—primarily mineral rights—through the payments of bribes and the ongoing payment of kickbacks of revenues derived from these mineral rights.  A recent judgment of Switzerland's federal appeals court (the "Swiss Judgment") quotes extensively from affidavit evidence and primary documentation obtained by the UK's Serious Fraud Office (the "SFO") during the SFO's own investigation into part of the DRC Embezzlement Enterprise.  Attached hereto as **Exhibits 9** and **10** are a true and correct copy of the Swiss Judgment and a translation of the portion of the judgment discussing the affidavit evidence and the primary documentation. The primary purpose of the Swiss Judgment is to address challenges made by "A Ltd." to the SFO's mutual legal assistance request to Switzerland.  The

DRC Embezzlement Enterprise is not the primary subject matter of the Swiss Judgment. Components of the DRC Embezzlement Enterprise are only addressed in great detail at paragraph 4.2 of the Swiss Judgment and thus, for the current purposes, only that paragraph has been translated.  *Id.* at **Exhibit 10**.  The substance of the judgment is also confirmed by **Exhibits 11** and **12**.

23.     The Swiss Judgment is the result of an unsuccessful challenge brought by an unidentified company whose Swiss bank records were sought during the SFO's investigation.  The Swiss Judgment, referencing the affidavits and primary documentation, describes a portion of a larger, sophisticated professional money laundering organization ("PMLO"), which forms part of the DRC Embezzlement Enterprise.  Between the years 2006 and 2011 (the time frame covered by the affidavit evidence—the scheme continued after that), Gertler "borrowed" $360,292,535 in cash from the PMLO in the DRC.  Gertler then used this cash to pay bribes to Katumba, who is described as Kabila's "*bras droit*" or "right arm", and other DRC government officials to secure and maintain access to DRC mining assets.  Gertler would then "repay" these loans by causing his lawyers to wire funds to the Swiss bank accounts of other entities forming part of the PMLO.  Attached hereto as **Exhibits 11** and **12** are true and correct copies of news reports regarding the Swiss Judgment, which substantiate the identities of "C", "L" and "M": *Bribe Totaling $360m': Docs Presented by Israeli Billionaire Dan Gertler Embroil Him in One of Biggest Graft Probes Ever*, HAARETZ, 15 Jul. 2021, and *Court documents show Gertler at centre of $360m cash laundry*,  AFRICA CONFIDENTIAL, 15 Jul. 2021.[2]

24.     Och-Ziff was just part of Gertler's broader scheme to obtain assets through

---

[2] Please see Exhibit 10 for translation of the portion of the judgment discussing the affidavit evidence and the primary documentation.

corruption, and Gertler is just part of an even broader system of bribery, money laundering and embezzlement which extends far beyond the mining sector. For instance, in addition to Gertler, numerous international companies with interests in the DRC have been making many hundreds of millions of dollars of payments to this same PMLO. That is, the broader DRC Embezzlement Enterprise is an expansive, international criminal conspiracy, through which senior DRC officials and their co-conspirators have embezzled countless DRC assets.

25.     While a large portion of the embezzled funds has been laundered outside of the United States, or has been otherwise dissipated, Plaintiff has obtained extensive evidence showing that millions of dollars of property is located in the United States, nearly all of which is directly traceable to these embezzled funds. Key findings of Plaintiff's investigation are set forth in substantial detail below.

### BGFIBANK RDC S.A. WAS USED TO PERPETRATE THE SCHEME

26.     The discovery obtained by Plaintiff revealed the use of BGFIBank RDC S.A. ("BGFI DRC") bank accounts by members of the Kabila family, its inner circle and the DRC government, to effectuate dissipation of DRC governmental assets to accounts controlled by the Kabila family, and the collection of payments to the Kabila family made by companies with business interests in the DRC.

27.     This fact has been corroborated and expanded upon by an unprecedented leak of 3.5 million documents from BGFI DRC, which is the basis of numerous investigative reports published by an international consortium of investigative journalists and non-governmental organizations known as "the Congo Hold-Up Consortium". *See Exposed—The Cost Of Kabila's State Capture*, Africa Confidential, November 19, 2021, attached hereto as **Exhibit 13** ("Congo Hold-Up Consortium Report").

28.     The Congo Research Group ("CRG"), an independent organization based at the Center on International Cooperation at New York University ("CIC NYU"), has meticulously documented family ties to Kabila and the DRC Embezzlement Enterprise with academic precision ("CRG Report").  *See All the President's Wealth*, CONGO RESEARCH GROUP, July 2017 (https://allthewealth.io/), attached hereto as **Exhibit 14.**  The CRG Report highlights the role of the Kabila family in numerous Kabila-controlled entities.  For instance, family members often use assumed names, which are frequently versions of one of Kabila's pseudonyms, Francis Mtwale. *Id.* at pp. 11, 13, 26, 30, 35, 37 & 40.

29.     Plaintiff's investigation is corroborated by the findings of accredited academics and researchers at CIC NYU, and shows that people who grew up with Kabila now hold key positions or ownership interests in various organizations, such as a Congolese company, Sud Oil Sprl ("Sud Oil"), Kwanza Capital, and Sezo International, all of which serve as conduits of laundered money between the USA and DRC.  *Id.* at pp. 10, 37, 40; *see also* Sud Oil's corporate minutes, attached hereto as **Exhibit 15** at p. 1; Sezo International Articles, attached hereto as **Exhibit 16** at p. 1; and a list of Kwanza Capital shareholders, attached hereto as **Exhibit 17,** at p. 1.  The nesting doll style of corruption is evidenced by the fact that Kwanza Capital is 20% owned by Sud Oil (20% of which is owned by Mteyu—Kabila's sister—and the other 80% of which is owned by Lutale).  *See* **Exhibit 15** at p. 1.

30.     The Sud Oil BGFI Account itself is controlled by Kabila's closest associates. Selemani himself served as Managing Director of BGFI DRC from 2010 until 2018.  *See Embezzled Empire: How Kabila's Brother Stashed Millions in Overseas Properties*, THE SENTRY, November 2021, attached hereto as **Exhibit 18.**  During that same period, Kabila's sister, Gloria Mteyu, owned 40% of BGFI DRC.  *See* **Exhibit 19**, *With His Family's Fortune at Stake, President*

*Kabila Digs In*, BLOOMBERG NEWS, 14 Dec. 2016.

31.     The documentation obtained and the analysis performed by the Congo Hold-up Consortium has greatly advanced Plaintiff's ability to fully trace DRC funds.  The Congo Hold-up Consortium has identified $138m of DRC embezzled funds siphoned off through BGFI DRC. The bulk of these DRC embezzled funds were diverted into the BGFI DRC account of Sud Oil. *See* **Exhibit 20**, Exposed—the cost of Kabila's state capture, AFRICA CONFIDENTIAL, 19 Nov. 2021.  The leaked records show that the DRC Central Bank itself sent $94.5 million to the BGFI DRC accounts of entities connected to the Kabila family, including Sud Oil.  *See* **Exhibit 21**, Biggest African Bank Leak Shows Kabila Allies Looted Congo Funds, BLOOMBERG NEWS, 19 Nov. 2021.

32.     The Sud Oil BGFI Account, bearing account number ████████14-36 ("Sud Oil BGFI Account"), *see* **Exhibit 22** (Sud Oil BGFI bank records), has been used in numerous suspicious transactions and BGFI DRC's own business records, documented within an internal audit report, uncovered several red flags for money laundering: a) explanations for transfers were inconsistent; b) some of Sud Oil's transfers lacked justification; and c) compliance officials were restricted from reviewing some of the transfers.  *See* **Exhibit 18**, at pp. 3 n. 4, 16 n. 103.

33.     An analysis of these bank records revealed that Sud Oil received at least $14.3 million in funds from a range of Congolese government institutions, including the Central Bank of Congo, and the DRC Mission.[3]  *See Id.*, at p. 3.

---

[3] The Sud Oil bank account records obtained by Plaintiff only reflect transactions through July 18, 2016.  The records obtained by the Congo Hold-up Consortium post-date these records and show that Sud Oil received "at least $85 million in funds from a range of Congolese government institutions, including the Central Bank of Congo, the DRC's permanent mission to the United Nations in New York, the Congolese state-owned mining company Gécamines, and the country's electoral commission." *See*, **Exhibit 18**, at p. 5.

**UN Transfers to the DRC Mission**

34.     Prior to the publication of the Congo Hold-Up Consortium's report, Plaintiff identified millions of dollars in embezzled funds originating with the DRC government, including funds purloined from the DRC Central Bank and the DRC Permanent Mission to the United Nations ("DRC Mission"), as well as at least $25 million in apparent bribe payments flowing into accounts at BGFI DRC controlled by Kabila family members and their associates.

35.     In response to one of Plaintiff's above-referenced subpoenas, Citibank produced documentation showing all incoming and outgoing wires going to and from the DRC Mission Citibank Account.   The records obtained from Citibank begin in December 2011.   Between December 2011 and March 2015, the DRC Mission Citibank Account only received a handful of *de minimis* wire transfers from the UN.   On February 19, 2014, the Citibank Account received $7,204.40 from the UN, and on October 20, 2014, the account received $8,987.00 from the UN. *See* **Exhibit 23**, DRC Mission Citibank Account Statements Ending-4434 at pp. 67, 85.   Beginning in March 2015 and continuing until at least March 2017, however, the UN began making periodic, large wire transfers to the DRC Mission Citibank Account, which received a total of $25,073,093.06 from the UN during that time.   To put this amount into perspective, the amount the UN paid into the DRC Mission Citibank Account in this two-year period exceeds all the payments made by the DRC government ($19,697,381.96) to the DRC Mission in the near ten-year timeframe covered by the bank records obtained by Plaintiff.

36.     Although the wires from the UN to the DRC Mission Citibank Account do not indicate a purpose, onward transfers of these funds describe them as, inter alia, "TRANSFER OF THE REIMBURSEMENT FUNDS FROM UN IN FAVOR OF THE D.R. CONGO TREASURY", "REIMBURSEMENT UN FUNDS - D.R CONGO", and "FONDS DRC

PEACEKEEPING".  *See* **Exhibit 24,** at pp. 2, 4-5.  The DRC subsequently confirmed that these were payments reimbursing the DRC for the participation of its armed forces in the UN's peacekeeping mission in Central Africa Republic. *See*, **Exhibit 18**, at p. 17.

37.      In total, the DRC Mission Citibank and DRC Mission United Nations Federal Credit Union ("UNFCU") Accounts received thirteen wires from the UN between 2015 and 2019. The following table contains a summary of those wires.  Plaintiff has grouped the wires from the UN into tranches based on how the proceeds of those wires were later distributed.

| Date | UN Wire Amount | DRC Mission Account | Description | Quantum of Tranche |
|---|---|---|---|---|
| 3/4/15 | $263,736.00 | Citibank | | |
| 3/4/15 | $1,707,624.00 | Citibank | | |
| 3/19/15 | $3,845,484.00 | Citibank | | |
| 6/18/15 | $3,804,192.00 | Citibank | | |
| 9/17/15 | $490,176.00 | Citibank | | |
| 9/18/15 | $3,280,716.00 | Citibank | First Tranche | $13,391,928.00 |
| 12/10/15 | $3,734,523.00 | Citibank | | |
| 3/16/16 | $3,601,126.00 | Citibank | Second Tranche | $7,335,649.00 |
| 6/15/16 | $717,132.00 | Citibank, then UNFCU | | |
| 12/12/16 | $388,171.50 | Citibank, then UNFCU | Third Tranche | $1,105,303.50 |
| 3/20/17 | $3,240,212.56 | Citibank, then UNFCU | Fourth Tranche | $3,240,212.56 |
| 6/18/18 | $240,595.92 | UNFCU | Fifth Tranche | $240,595.92 |
| 4/12/19 | $452,528.66 | UNFCU | Sixth Tranche | $452,528.66 |
| | | | TOTAL: | $25,766,217.64 |

38.      Of the $25,766,217.64 deposited by the UN into the DRC Mission Citibank and UNFCU Accounts, $12,172,354.00 is known to have been embezzled by the DRC Embezzlement Enterprise, as detailed below, and the fate of roughly $13 million is unknown.

| Description | Amount |
|---|---|
| Transferred Sud Oil (wire fraudulently noted the beneficiary as the DRC Central Bank) | $ 6,809,854.00 |

| | |
|---|---|
| Transferred to personal accounts of DRC Head of UN Mission | $  2,620,000.00 |
| Transferred to personal accounts of other DRC officials (known) | $  2,292,500.00 |
| Transferred to personal accounts of other DRC officials (inferred) | $     450,000.00 |
| TOTAL | $ 12,172,354.00 |

39.     For reasons set forth below, the other roughly $13 million very well also may have been lost to the DRC Embezzlement Enterprise.  The specific bank account to which the bulk of those funds ($13,391,928.00) was wired is associated with the disappearance of other DRC funds, and the holder of that account (the DRC Central Bank) contemporaneously made substantial payments to companies close to Kabila that form part of the DRC Embezzlement Enterprise.

> i.     *First Tranche*

40.     Between March 2015 and mid-September 2015, the DRC Mission Citibank Account received $13,391,928 in six wire transfers from the UN.  *See* **Exhibit 25** at pp. 5-6, 8-9, and 12-13.  On October 28, 2015, the DRC Mission transferred this exact amount from its Citibank Account to account number ███████02-69 USD held by the DRC Central Bank at Rawbank ("DRC Central Bank Rawbank Account"), a bank based in the DRC.  *See* **Exhibit 24** at p. 2.  These funds did not benefit the DRC Central Bank, but rather the DRC Embezzlement Enterprise.

41.     The DRC Central Bank Rawbank Account has been used in another embezzlement scheme contemporaneous with the transfer of the First Tranche, receiving at least two so-called payments of "Gecamines Tax Advances."  Letters from Gecamines directed its bank to make tax advance payments to the DRC Central Bank Rawbank Account.  *See* **Exhibit 26**.   Gecamines is a mining company wholly owned by the DRC.  Gecamines has not made a profit in decades and has no tax obligations, nor is it likely to in the foreseeable future.  These and other "tax advance" payments made by Gecamines to the DRC Central Bank, which total hundreds of millions of

dollars, do not appear on contemporaneous DRC Central Bank accounting records.  Rather, the

line item for Gecamines' tax payments is zero.  *See* **Exhibit 27**.  DRC Central Bank records show,

inter alia, that Gecamines made no tax payments between 2003-2016. These records contain a

heading "*autres recettes fiscales*", or in English, "other tax receipts".  Item (e) under this heading

is labeled Gecamines.

42.     This particular scheme of embezzling DRC funds by disguising the payments as

"tax advances", has been reported by The New York Times:

> The most suspicious documents to emerge recently include a string
> of bank transfers to different accounts at different banks with the
> notation that they were "advance tax payments" from Gécamines, a
> struggling state-controlled mining company, for Congo's central
> bank. Starting late last year, the transfers reveal anomalies like
> instructions that $8 million be withdrawn from the teller — in cash
> — on behalf of the central bank.
>
> "That makes no sense," said a former employee of Congo's central
> bank who spoke on the condition of anonymity, saying he could be
> killed if he was identified. "We don't get cash from a commercial
> bank. We import our own cash. We have a service in Switzerland
> that does that."
>
> Analysts at the Sentry, an investigative arm of the Enough Project,
> said that during the time of the supposed Gécamines transfer of
> $95.7 million to the central bank, the central bank's foreign reserves
> actually dropped — to $1.17 billion from $1.47 billion — pushing
> up inflation and causing issues for Congo's economy. At the same
> time, Mr. Kabila's government drastically cut spending on health
> care and the few services it provides.
>
> Sentry analysts said they were curious how Gécamines, a company
> with endless management problems, would have that much cash on
> hand for advance tax payments when thousands of employees had
> not been paid in months. Documents showed that Gécamines lost
> $82.9 million in 2014. Mining executives said bigger, more
> profitable companies always paid much less in advance taxes.

*See* **Exhibit 28**, News article: *As President Joseph Kabila Digs In, Tensions Rise in Congo*, NY

TIMES, 17 Dec. 2016.

ii.   *Second Tranche*

43.     In addition to the DRC Central Bank Rawbank Account being associated with other vanishing DRC funds, the DRC Central Bank has also transferred tens of millions of dollars to companies owned and controlled by Kabila's closest associates and family members.  *See* **EXHIBIT 29**, News article *DRC Company Promised Cheap Food, Delivers Stolen Money*, ORGANIZED CRIME AND CORRUPTION REPORTING PROJECT, 8 Nov. 2017.  In addition, bank records show that Sud Oil received $7,500,000 from the DRC Central Bank just months after the DRC Mission wired $13,391,928 to DRC Central Bank Rawbank Account.  *See* **Exhibit 22** at p. 4.

44.     In December 2015 and March 2016, the UN made two more wire transfers to the DRC Mission Citibank Account, totaling $7,335,649.00.  *See Id.* at p. 8.

45.     The following transaction between a Kabila controlled entity and entities controlled by the recipients of embezzled funds is emblematic of the red-flagged, papered over transactions Kabila's inner circle used their positions of power to effectuate (*i.e.*, blatant money laundering): on April 29, 2016, the DRC Mission wired $6,809,899 of the $7,335,649 from its Citibank Account, to a purported DRC Central Bank account held at BGFI DRC.  *See* **Exhibits 24**, at 1.  The outgoing wire information from Citibank abbreviates the originator of the wire, i.e., the DRC Mission, as "PERM. MISSION OF REP OF C".  Plaintiff has reviewed thousands of wire transfers to and from the DRC Central Bank, but the DRC Central Bank account number for its purported account at BGFI DRC contained in the wire does not appear in any other wire transfers.  This wire contained fraudulent beneficiary and account information designed to induce Citibank to wire the funds to BGFI DRC where they could be embezzled by members of Kabila's family and his closest associates.

46.     Records from BGFI DRC show that BGFI DRC did not credit these funds to the

DRC Central Bank's purported account, but rather, on May 16, 2016, BGFI DRC credited $6,809,854.00 (the quantum of the wire originating with DRC Mission Citibank Account minus an apparent $45 fee) to the Sud Oil BGFI Account. *See* **Exhibit 22** (Sud Oil BGFI bank records) at pp. 3-4. The Sud Oil BGFI Account records show the originator of the funds deposited by BGFI DRC into the Sud Oil BGFI Account as "PERM. MISSION OF REP OF C" (the exact same abbreviation used in the Citibank outgoing wire records). *Id.* at p. 4. On the same day, BGFI DRC also credited Sud Oil's account with another $7.5 million, originating with the DRC Central Bank, meaning Sud Oil received $14.3m of DRC government funds on one day alone, shortly after which Selemani and Lutale began acquiring real estate worth several million dollars, including the Maryland Properties. *Id.* at pp. 4-5.

### Purchase of Maryland Properties

47.     Plaintiff's investigation revealed that Selemani and Lutale were the beneficiaries of millions of dollars of embezzled DRC government funds, which they used for their own personal benefit, including to purchase the Maryland Properties. The information cited below from the report entitled *Embezzled Empire: How Kabila's Brother Stashed Millions in Overseas Properties*, THE SENTRY, November 2021, and the corresponding U.S. bank records referenced therein will be obtained and authenticated through discovery in this action.

48.     BGFI DRC records show that Sud Oil sent more than $12 million to accounts and companies linked to and controlled by Selemani and Lutale between 2015 and 2018. *See* **Exhibit 18** at p. 13:

- in June 2016, Sud Oil sent $300,000 to Selemani's US based bank account;

- in July 2016—**two months after receiving the May 16, 2016 transfers from the DRC Mission and DRC Central Bank**—Sud Oil sent $7.4 million to DRC-based

investment firm Ascend Trust, which is owned by Selemani and Lutale.  The records reflect that the purpose of the transfer was to facilitate real estate purchases;

- in April 2017, Sud Oil sent $1 million to Ascend Trust;

- in February 2017, Sud Oil sent another $1 million to Ascend Trust;

- in June 2017, Sud Oil sent two identical $1.12 million transfers labeled "investment funds" to a South Africa-registered company Garvelli controlled by Selemani and Lutale.

49.     Selemani also wired money from accounts at BGFI DRC to his own foreign bank accounts, as well as to accounts in the United States and South Africa for the Balanne Trust and Garvelli.  **Exhibit 18** at pp. 6 n. 30, 7, 13.

- in May 2015 Selemani's US bank account received $300,000 from an internal BGFI DRC account;

- in June 2015 Selemani's US bank account received $540,000 from an internal BGFI DRC account;

- in August 2015 Selemani's US bank account received $150,000 from an internal BGFI DRC account; and

- in September 2018, Selemani sent €1.1 million to the Balanne Trust.

50.     Both the Balanne Trust and Garvelli were used by Selemani and Lutale to purchase millions of dollars in foreign real estate, 17 properties in total for $6.6 million, including the four in Maryland at issue in this matter.

51.     The first property purchased in Maryland by Selemani and Lutale on April 10, 2015 for approximately $670,000 was a single-family four-bedroom row house in Rockville, Maryland. The deed indicates that the property served as Selemani's primary residence. *See* **Exhibit 18** at p.

8, p. 26 n. 146; *see also* **Exhibit 30**.

52.     Bank transfer documentation shows that around the time of the transaction, Selemani sent nearly $1 million to a United States account held in his name at SunTrust bank for the stated purpose of buying and developing properties.  *See* **Exhibit 18**, at p. 8.  The SWIFT transactions were labeled "acquisition immo," an abbreviation for "property purchase," and "frais amenagement immobilier," a reference to property development.

53.     A comparison of SWIFT messages and transaction records for both the internal bank account held by BGFI DRC and Selemani's personal BGFI DRC account revealed that the funds transferred to Selemani's US bank account had no corresponding debit on Selemani's personal BGFI DRC account, meaning that the internal bank account held by BGFI DRC—rather than Selemani himself—wired the funds to his US bank account.  The internal bank account transferred the funds to a BGFI DRC correspondent account for the indicated purpose of "FRAIS CORRPMT TRAITE," an abbreviation for correspondent fees processed.

54.     On April 17, 2018, Lutale transferred the first property to the Balanne Trust.  *See* **Exhibit 18**, at pp. 10 & 26.  Lutale served as trustee of Balanne Trust and uses her married name of Aneth Dorah SF Mtwale or Aneth D. SF Mtwale when she stated her capacity as Trustee on the four deeds for the Maryland Properties.

55.     In 2018, Selemani and Lutale used the Balanne Trust for millions of dollars in real estate acquisitions.  All four of Selemani's US properties (in Maryland) and one of his South African properties are owned through trusts.  *See* **Exhibit 18**, Maryland State Archives, "Deed," Book 55925, pp. 328-331, available at: https://mdlandrec.net/main/dsp_search.cfm; **Exhibit 18**, p. 10 at n. 61, Maryland State Archives, "Deed," Book 56112, pp. 124-131, available at: https://mdlandrec.net/main/dsp_search.cfm; **Exhibit 18**, p. 10 at n. 61, Maryland State Archives,

"Deed," Book 57085, pp. 367-374, available at: https://mdlandrec.net/main/dsp_search.cfm; and

**Exhibit 18**, p. 10 at n. 61, Maryland State Archives, "Deed," Book 56130, pp. 1-8, available at:

https://mdlandrec.net/main/dsp_search.cfm.

56.     On May 15, 2018, Selemani and Lutale purchased a three-bedroom, four-floor luxury townhouse in Bethesda, Maryland through the Balanne Trust for approximately $1,224,999. *See* **Exhibit 18** at p. 26 n. 147; and **Exhibit 31**.

57.     In late September 2018, Selemani wired 1.1 million Euro to the Balanne Trust, *supra* at ¶49.

58.     On December 18, 2018, Selemani and Lutale purchased a three-bedroom luxury townhouse in Bethesda, Maryland through the Balanne Trust for approximately $884,720.  *See* **Exhibit 18** at p. 26 n. 148; and **Exhibit 32**.

59.     On December 18, 2018, Selemani and Lutale purchased a three-bedroom luxury townhouse in Bethesda, Maryland through the Balanne Trust for approximately $1,377,237.  *See* **Exhibit 18** at p. 26 n. 149; and **Exhibit 33**.

60.     All four Properties are located in Montgomery County, Maryland, one of the country's most expensive real estate markets.  Three of the four properties are new luxury townhouses in a neighborhood where median house prices exceed $1 million.  These properties include two newly built four-story luxury townhouses with personal elevators and full-level rooftop terraces.  Address records and rental websites suggest that three of the Maryland Properties have been leased, providing him a lucrative source of additional income.  *See* **Exhibit 18** at p. 10.

61.     Because the acquisition of the Maryland Properties were all-cash transactions, Selemani and Lutale were able to avoid the standard due diligence performed in connection with bank financing which would have red-flagged the source of their wealth—embezzled DRC funds.

62.     Under the circumstances and as set forth in this application, good and sufficient cause exists for immediate relief because the requested relief is necessary to prevent further harm to Plaintiff.  Absent relief securing the Judgments, further delay and dissipation of the subject assets will likely result.

Dated: New York, New York
       September 16, 2022

DocuSigned by:

*Peter Grossman*

6AB245D267F5460...

Peter Grossman