# EXHIBIT 18

# Embezzled Empire

NOVEMBER
—— 2021

How Kabila's Brother Stashed
Millions in Overseas Properties



THE SENTRY

# Embezzled Empire:

## How Kabila's Brother Stashed Millions in Overseas Properties

November 2021



THE SENTRY

## Table of Contents

**Executive Summary**     3

**Public Funds, Private Property**     5

**Stash Pads**     8

**Risk Indicators and Red Flags**     14

**Conclusion**     17

**Recommendations**     18

**Annex**     23

**Endnotes**     28

We are grateful for the support we receive from our donors who have helped make our work possible. To learn more about The Sentry's funders, please visit The Sentry website at www.thesentry.org/about/.



## Executive Summary

Although President Joseph Kabila's final term as head of the Democratic Republic of Congo (DRC) was set to end in December 2016, he clung to power and delayed elections for another two years. While the eyes of many observers were fixed on the election stalling tactics in Kinshasa, Kabila's brother Francis Selemani purchased numerous luxury homes in the United States and South Africa, it appears at least in part using funds diverted from the Congolese government.[1] At the time, Selemani was managing director of BGFIBank DRC, the Congolese subsidiary of Gabon-based BGFIBank Group.[2, 3] Selemani and the Kabila family used a network of companies and the bank they controlled to misappropriate public funds, transferring millions abroad and purchasing millions of dollars in foreign real estate. They moved substantial sums through BG-FIBank DRC with little to no resistance. Among the most problematic transactions, according to an internal audit at BGFIBank DRC, were multimillion-dollar transfers involving an obscure company called Sud Oil.[4]

Millions of leaked bank records obtained by the Platform to Protect Whistleblowers in Africa (PPLAAF) and Mediapart and shared with The Sentry by PPLAAF and the European Investigative Collaborations (EIC) network reveal that between 2015 and 2018, Sud Oil sent more than $12 million to accounts and companies owned or controlled by Selemani.[5] Investigations by The Sentry, Congo Research Group, and other members of the Congo Hold-up consortium, the international group of non-profit organizations and media outlets collaboratively investigating the leak, show that Sud Oil received at least $85 million in funds from a range of Congolese government institutions, including the Central Bank of Congo, the DRC's permanent mission to the United Nations in New York, the Congolese state-owned mining company Gécamines, and the country's electoral commission.[6] At the same time that the $12 million was transiting accounts held by Selemani and companies linked to him and his wife, Selemani purchased 17 properties for a total of $6.6 million in the affluent suburbs of Washington, DC, and Johannesburg, South Africa.[7]

The Sentry identified a range of irregularities, misrepresentations, and inconsistencies in transactions connected to bank accounts held by Selemani and his companies that are red flags for money laundering and other financial crimes. Funds received from public institutions lacked justification, and the sources of funding for some transfers were misrepresented. Selemani used corporate vehicles that obscured his identity as the owner of all but one of the 17 real estate purchases discovered by The Sentry.[8] Selemani had originally purchased nine properties in his own name, but he then transferred ownership to a commercial company and to trusts he controlled, including by selling them to his own company, in a series of operations that is a red flag for money laundering through real estate.

### Key recommendations

**Open an investigation into these real estate purchases.** Authorities in the United States and South Africa should investigate the source of funds used by Selemani and his relatives to buy properties in their respective countries. If appropriate, they should pursue legal mechanisms to forfeit and seize properties purchased with the proceeds of corruption or other illicit means.

**Conduct a thorough internal investigation.** Any financial institution that has engaged in a correspondent banking relationship with BGFIBank DRC or processed transactions involving the bank should conduct a thorough internal investigation to ascertain whether it has participated in violations of law or contravened internal policies. The investigation should include a review of the financial institution's internal controls around


TheSentry.org

anti-money laundering (AML) and anti-corruption compliance. Appropriate remedial action should be implemented immediately.

**Ensure that the US and South African real estate sectors comply with Financial Action Task Force (FATF) customer due diligence standards.** The US Department of the Treasury's Financial Crimes Enforcement Network (FinCEN) should require real estate agents and other professionals involved in real estate transactions, such as lawyers, to maintain AML programs, file suspicious activity reports, and comply with other record-keeping and reporting requirements, including the identification of beneficial ownership information and source of funds. South Africa's Financial Intelligence Centre (FIC) should vigorously enforce the 2017 additions to the Financial Intelligence Centre Act (FICA) that put these requirements in place. FinCEN and the FIC should provide training and testing to ensure compliance with established standards.

**Issue a public advisory on the money laundering risks in real estate.** FinCEN should issue an updated public advisory to US financial institutions warning of the risks for money laundering through real estate, including the involvement of family members of politically exposed persons (PEPs) highlighted in this report. FinCEN should also expand and make permanent the geographic targeting order (GTO) program to cover all real estate purchases, regardless of location in the US.



## Public Funds, Private Property[*]

In the final years of Joseph Kabila's presidency, millions of dollars in public funds transited through a bank run by his brother and part-owned by another family member,[9] moving through a labyrinth of corporate entities and often winding up in accounts controlled by Kabila family members or inner circle. And at the center of it all was an obscure Congolese company called Sud Oil.

The name Sud Oil had previously belonged to a now-defunct fuel distribution company that had briefly held a small stake in a Congolese oil bloc. The company was owned by Pascal Kinduelo, a prominent Congolese businessman with close ties to Kabila, who liquidated its assets in 2011 and ended his relationship with the company in 2012.[10] Sud Oil reemerged in late 2013 without much fanfare, setting up an office in an inconspicuous commercial garage in Gombe, Kinshasa's business district.[11]

The low profile maintained by the company stands in stark contrast to its owners' prominence. At the time, Sud Oil was majority-owned by Aneth Lutale, the wife of Francis Selemani Mtwale, Kabila's brother. Kabila's family member, Gloria Mteyu, also owned a 20% share.[12, 13] In addition to their connections to the presidency, Sud Oil's stewards were plugged into the country's banking sector. Mteyu personally held a 40% stake in BGFIBank DRC,[14] a subsidiary of Gabon-headquartered BGFIBank Group, where Selemani served as board member and managing director—and where Sud Oil maintained its accounts.[15]

There are reasons to question the accuracy of Sud Oil's self-description as an oil company.[16] As part of a 2019 investigation into Kwanza Capital—a company partly owned by and co-located with Sud Oil—The Sentry conducted an extensive review of Sud Oil's banking data and interviewed people with knowledge of its banking activity and operations but was unable to identify commercial activity in line with its stated objectives.[17] In addition, The Sentry found that Kwanza Capital may have been intended to serve as a vehicle to obfuscate links to the Kabila family and its inner circle and evade scrutiny.[18]

The Congo Hold-up consortium, however, has found that these unusual maneuvers were just the tip of the iceberg. Leaked bank records reveal that Sud Oil received at least $85 million in funds without justification from a range of Congolese government institutions, including the Central Bank of Congo, the Democratic Republic of Congo's (DRC) permanent mission to the United Nations in New York, Congolese state-owned mining company Gécamines, and the country's electoral commission.[19]

The Sentry and other members of the Congo Hold-up consortium have determined that Sud Oil and other firms linked to the Kabila family were involved in numerous suspicious transactions at BGFIBank DRC that are indicative of money laundering, enabling the Kabila family to circulate funds clandestinely throughout their business network.[20, 21] An internal audit by BGFIBank DRC from June 2018 similarly identified red flags for money laundering, noting that explanations for transfers were inconsistent, some of the Sud Oil transfers lacked justification, and BGFIBank compliance officials were restricted from reviewing some of the transfers.[22]

---

[*]    Reports by The Sentry are based on interviews, documentary research, and, where relevant, financial forensic analysis. In some cases, sources speak to The Sentry on the condition that their names not be revealed, out of concern for their safety or other potential retaliatory action. The Sentry establishes the authoritativeness and credibility of information derived from those interviews through independent sources, such as expert commentary, financial data, original documentation, and press reports. The Sentry endeavors to contact the persons and entities discussed in its reports and afford them an opportunity to comment and provide further information.



Between 2015 and 2018, Sud Oil sent more than $12 million to Selemani's own accounts and to companies he owned or controlled, according to BGFIBank DRC records reviewed by The Sentry.[23, 24] Transaction records show that Sud Oil paid $7.4 million to DRC-based investment firm Ascend Trust, majority owned by Selemani's wife Lutale, within months of receiving the transfers from the Congolese central bank and the DRC's permanent mission to the United Nations.[25, 26, 27] The same records state the purpose of the transfer as being for real estate purchases. Ascend Trust spent most of the rest of the funds domestically.[28, 29]

In turn, Ascend Trust, Sud Oil, and Selemani wired money from accounts at BGFIBank DRC to Selemani's own foreign bank accounts, as well as to accounts in the US and South Africa for two companies controlled by Selemani and Lutale: US-registered Balanne Family Living Trust and South Africa-based company Garvelli.[30] Both of these entities were used to purchase real estate in the United States and South Africa over the same period.





# Money Flows Abroad

In mid-2016, Sud Oil received $7.5 million from the Congolese central bank and $6.8 million from the DRC's permanent mission to the United Nations. The firm subsequently sent Ascend Trust $9.5 million over the next year, including $7.4 million that originated from these government sources. Sud Oil and Selemani himself also sent more than $3.5 million abroad to companies that jointly purchased real estate. These purchases took place between 2015 and 2018 while Selemani served as BGFIBank DRC's managing director.*



Central Bank of Congo

$7.5 MILLION

Diplomatic mission

$6.8 MILLION

Sud Oil

$9.5 MILLION

$2.2 MILLION

Garvelli

Ascend Trust

$100,000

Selemani's bank account

$600,000

Selemani's bank account

BGFIBank DRC

$1 MILLION

$1.4 MILLION SEVERANCE

Selemani's bank account

$1.4 MILLION

Balanne Family Living Trust

## Key

- GOVERNMENT
- COMPANIES
- ACCOUNTS

*The Sentry established the financial flows depicted in this graphic with banking records for the accounts of Sud Oil, Ascend Trust, and Selemani.

## Stash Pads

In the period between the relaunch of Sud Oil and the conclusion of Kabila's presidency, Selemani purchased a total of 17 properties in the United States and South Africa for approximately $6.6 million. Selemani and his companies received a total of more than $3 million in US and South African bank accounts, for which the wire transfers bore apparently inaccurate details that misrepresented the origin of the funds identified in account records.[31, 32]

Selemani's first property in the US was a single-family home in Rockville, Maryland, purchased in August 2015 that, according to the deed, served as his primary residence.[33] Bank transfer documentation shows that, in the three months before the transaction, Selemani sent nearly $1 million to a US account held in his name at SunTrust bank for the stated purpose of buying and developing properties.[34]



**Francis Selemani**

During his tenure at BGFIBank DRC, Selemani was involved in millions of dollars' worth of irregular transactions with companies known to have close ties to the Kabila family.

### Key Figures

- **17 properties** bought for **$6.6 million** between 2015 and 2018:
  - **4 US properties** bought for $4.2 million
  - **13 South African properties** bought for $2.4 million

- Among the homes:
  - **5 properties** owned by **trusts** bought for $4.5 million

- Selemani's companies received more than **$12 million** from Sud Oil, including funds that originated from **government sources.**

- Selemani's US account received nearly **$1 million** from an internal account at BGFIBank DRC.

- Since 2019, after Selemani left BGFIBank DRC, **3 more properties** were purchased for **$1.2 million** total.

Transaction records specify that the funds came from Selemani's BGFIBank DRC account. However, The Sentry's analysis shows that the money originated from an internal account held by BGFIBank DRC itself.[35, 36] The internal account, normally used to undertake certain types of technical operations within the bank, appears to have been used as a mechanism for hiding some questionable fund transfers involving clients linked to the bank's management.

In the case of the funds transferred to Selemani's account overseas, there was no corresponding debit on Selemani's account at BGFIBank DRC.[37] This means that Selemani himself did not wire the funds to his overseas account, but rather the internal account directly wired the funds to Selemani's US bank account.

When the internal bank account held by BGFIBank DRC wired funds to Selemani's account in the US, one of the bank's correspondent banking partners—Germany's Commerzbank—processed the US-dollar denominated transaction.[38, 39] Commerzbank declined to comment on any specific transactions, citing legal requirements for client confidentiality.[40] The Sentry identified additional instances when BGFIBank DRC management



appears to have facilitated questionable transactions, most of which relate to the Kabila family and its commercial interests, through the same internal account.[41]

In another case of wire transfers undertaken using documents that misrepresented the origin of the funds, in June 2017, Sud Oil made two identical $1.12 million transfers, labeled "investments funds," to Garvelli, a South Africa-registered firm controlled by Selemani and his wife. Records from BGFIBank DRC indicate that the two payments were justified with invoices for $2.33 million in construction equipment that Garvelli sold to MW Afritec,[42] a DRC-based company whose shareholders are close Kabila associates.[43] And while the documents the bank uses to carry out wire transfers, known as SWIFT messages, and correspondence at the bank identified MW Afritec as the sender, BGFIBank DRC's transaction records show that Sud Oil was the source of the money.[44]



Selemani's South African company Garvelli received $2.2 million from Sud Oil the same month this five-bedroom home on 2 acres of land was purchased by the company. Source: Residential People

After receiving these funds, Garvelli purchased properties worth more than $2.2 million in South Africa, beginning with a five-bedroom house on June 17, 2017.[45] Then, over the course of a single day in February 2018, several months before Selemani left his post at BGFIBank DRC, Garvelli purchased six South African properties that Selemani and his wife had originally purchased in 2015 and 2016 in their own names for less than $150,000 each, a figure unlikely to raise alarm.[46, 47, 48, 49, 50, 51, 52, 53] Selemani also transferred a propriety into the name of South African trust Primal Trust on the same day.[54]

Selemani's South African properties are located in Sandton, one of the most affluent areas of Johannesburg. There, he bought several homes in the Dainfern Golf Estate through Garvelli in 2019 and 2020, according



to deeds and property registry information reviewed by The Sentry.[55, 56, 57] Dainfern Golf Estate was listed as the third-most expensive housing complex in Gauteng, the province containing Johannesburg, with a median asking price of 7,750,000 rand ($618,000) in 2018.[58, 59] The estate's website boasts an "incomparable lifestyle and recreational experience centered around the Gary Player designed golf course enhanced by nature trails, parks, and sports facilities all located in its own 320-hectare 'suburb.'"[60] There are yoga and running clubs, volleyball and squash courts, and a restaurant overlooking the golf course.



Selemani's company Garvelli purchased three homes in the Dainfern Golf Estate community. Source: Dainfern Golf Estate website.

Once he began using trusts and Garvelli to buy properties in South Africa, Selemani made fewer, higher-value purchases. Selemani used a trust, rather than a commercial company, for more than $4.5 million in real estate acquisitions,[61] including three new properties in the United States purchased through Balanne Family Living Trust, for which Lutale served as trustee. Through this trust, Selemani bought two US properties totaling more than $2 million in the weeks surrounding his departure from BGFIBank DRC in May 2018.[62, 63] In late August 2018, a week after receiving his $1.45 million severance pay—equivalent to four years' salary—Selemani wired $1.37 million to Balanne Family Living Trust's US account.[64, 65] The trust purchased a townhouse in the Grosvenor neighborhood in the Washington, DC, suburbs for $1.38 million a few months later, in December 2018.[66]

Selemani's four US properties are located in Maryland's Montgomery County, one of the country's most expensive real estate markets.[67] Three of the four properties are new luxury townhouses in a neighborhood where median house prices exceed $1 million.[68] These properties include two newly built four-story luxury townhouses with personal elevators and full-level rooftop terraces.[69, 70, 71] Address records and rental websites suggest that three of Selemani's properties in the US have been leased, providing him a lucrative source of additional cash—$4,800 a month in the case of one townhouse.[72]



The same month in which Selemani ended his tenure as managing director of BGFIBank DRC, Balanne Family Living Trust purchased this new townhouse for $1.2 million. Source: BrightMLS.

Selemani's use of two trusts, Primal Trust and Balanne Family Living Trust, for property purchases obscures ownership details, which in some cases, may shield them from forfeiture.[73] Unlike information on commercial companies, information on who owns and controls trusts in South Africa or the United States is much more difficult to obtain. Lack of public access to this information can protect trusts from being targeted in lawsuits.[74]

**EVERYWHERE MAN**

Starting in 2016, Selemani sought to obtain secondary residency or citizenship in three countries, according to leaked records reviewed by The Sentry.[75] Email correspondence and foreign transactions indicate that Selemani invested 1 million rand ($69,000) in a South African business in July 2016, a move that would enable his relatives to reside there. He made a $40,989 transfer to Arton Capital Holdings Ltd in July 2017 for the "Grenada citizenship by investment program,"[76] which allows successful applicants who operate a qualifying business in the US to reside there and travel visa-free to more than 125 countries.[77, 78] Arton Capital says its service "empowers high net worth individuals and families to become global citizens by investing in a second residence or citizenship."[79] Selemani then transferred more than 500,000 euros (about $611,000) to his wife Lutale in February 2018,[80, 81] purportedly for a US investor visa.[82, 83] Such moves provide improved global mobility, new business opportunities, tax optimization, and security in the event of political, economic, or social unrest.





# Selemani's Network



Sud Oil sent millions of dollars to a group of companies and trusts controlled by Selemani and his wife. Selemani and these companies purchased 17 properties in South Africa and the US between 2015 and 2018 for a total of $6.6 million. In 2019 and 2020, these companies bought three additional properties in the Johannesburg suburbs for a total of $1.2 million.*



12

*The Sentry established the relationships of ownership and control depicted in this graphic with publicly available documents and reports, Sud Oil's articles of incorporation, and property deeds.


THE SENTRY

# Timeline of Events

Over the course of several years leading up to the end of his tenure at BGFIBank DRC, Selemani and companies under his control received more than $12 million from Sud Oil and sent millions of dollars abroad to foreign bank accounts held by entities that purchased properties in South Africa and the US, including Garvelli and Balanne Family Living Trust.

## Key

 Selemani purchase

Purchase by company or trust

Purchase or transfer from Selemani

**MARCH 2015** 
Selemani purchases five South African properties. 

**JUNE 2015** 
Selemani's US account receives $540,000 from an internal account held by BGFIBank DRC.

**FEBRUARY 2016** 
Selemani purchases two South African properties.

**JUNE 2016** 
Sud Oil sends $300,000 to Selemani's US account.

**MAY 2015**
Selemani's US account receives $300,000 from an internal account held by BGFIBank DRC.

**AUGUST 2015** 
Selemani's US account receives $150,000 from an internal account held by BGFIBank DRC.

Selemani purchases one US property.

**MAY 2016**
Congolese Central Bank and the DRC's permanent mission to the UN send $7.5 million and $6.8 million respectively to Sud Oil.

**JULY 2016**
Sud Oil sends $7.4 million to Ascend Trust.

**AUGUST 2016** 
One South African property purchased, finalized by Garvelli in June 2018.

**NOVEMBER 2016** 
Selemani purchases one South African property.

**APRIL 2017** 
Sud Oil sends $1 million to Ascend Trust; Garvelli is incorporated.

Garvelli purchases one South African property.

**JULY 2017**
Elections postponed again.

Selemani sends $41,000 to Arton Capital Holding Ltd.

**SEPTEMBER 2016**
Ascend Trust sends $100,000 to Selemani's South African account.

DRC elections postponed.

**FEBRUARY 2017**
Sud Oil sends $1 million to Ascend Trust.

**JUNE 2017**
Sud Oil sends Garvelli $2.2 million, marking MW Afritec as sender on documents.

Garvelli purchases one South African property.

**FEBRUARY 2018** 
Selemani sends €500,000 to Aneth Lutale for EB-5 visa.

Garvelli purchases eight South African properties, six of which are purchased from Selemani.

Primal Trust purchases one South African property from Selemani.

**APRIL 2018** 
Balanne Family Living Trust purchases one US property from Aneth Lutale.

**AUGUST 2018** 
Selemani receives $1.4 million severance from BGFIBank DRC.

**DECEMBER 2018** 
Elections held.

Balanne Family Living Trust purchases one US property.

**JUNE 2020** 
Garvelli purchases one South African property.

**MAY 2018** 
Selemani leaves BGFIBank DRC.

Balanne Family Living Trust purchases two US properties.

**SEPTEMBER 2018**
Selemani sends €1.1 million to Balanne Family Living Trust.

**APRIL 2019** 
Garvelli purchases one South African property.

**SEPTEMBER 2020** 
Garvelli purchases one South African property.

## Risk Indicators and Red Flags

The transactions examined in this report exhibit numerous risk factors for corruption and money laundering that should typically prompt added scrutiny from global banks processing the transactions and from real estate professionals involved in the property sales.



**The use of companies and trusts that conceal beneficial ownership.**[84, 85] As of November 2021, one company and two trusts controlled by Selemani and his wife hold all but one of the 17 identified real estate purchases made during Selemani's stint as an executive at BGFIBank DRC.[86] Selemani had originally purchased nine properties in his own name, but he later transferred ownership of eight properties to a commercial company and trusts he controlled, including by selling them to his own company.



**Payment of funds sourced from high-risk jurisdictions.** The DRC is considered a high-risk jurisdiction for money laundering and public sector corruption.[87] However, Selemani initially used local addresses belonging to relatives or associated businesses on property deeds and associated paperwork.[88] As a result, real estate agents may have missed the fact that the buyer lived far away from the property, a possible indicator of money laundering, or they may simply have been unaware that the funds originated in the DRC.[89]

**Purchase of luxury real estate by a foreign PEP or a family member of a foreign PEP.** The Financial Action Task Force (FATF)—the international body that sets standards for money laundering controls—recommends that financial institutions take measures to detect and prevent the abuse of the international financial system by individuals serving in prominent official positions, also known as politically exposed persons (PEPs).[90] The FATF's recommendations for enhanced due diligence would also apply to Selemani, as a close relative of a head of state.[91]

**Payment for luxury property in cash.** Because many of Selemani's real estate acquisitions were all-cash purchases, he was able to avoid the standard due diligence performed in connection with bank financing—due diligence that might have raised questions about the source of his wealth. In total, Selemani bought US real estate worth nearly $3.5 million in cash.

## Red flags

Many of the transactions described in this report involved BGFIBank DRC, a financial institution that drew media scrutiny throughout the same period for issues ranging from corruption and money laundering to lax sanctions and counter terror finance controls.[92] The fact that the president's family controlled this bank—and many of the accounts in question—should have triggered additional scrutiny by partner financial institutions in order to protect against money laundering and improve their ability to identify the source of funds.[93] In fact, Selemani featured prominently in several of the exposés about BGFIBank DRC during this period.[94] Large unjustified transfers to a company's top executive, especially one who qualifies as a family member of a PEP, are in and of themselves red flags for money laundering.[95]

Beyond the circumstances of the transactions, The Sentry identified a range of irregularities, misrepresentations, and inconsistencies pertaining to the transactions that are indicators for money laundering or financial crimes. Investigators and bank regulators undertaking reviews of these transactions should evaluate whether banks took the appropriate steps to respond when presented with these red flags. Some of the most notable red flags are as follows.

**Funds received from public institutions lacked reasonable justification.** Over the course of a single day in May 2016, Sud Oil received $7.5 million from the Central Bank of Congo and approximately $6.8 million from the DRC's permanent mission to the United Nations.[96, 97, 98, 99] The bank provided no reasonable justification for these transfers, and Sud Oil engaged in no commercial activity that would warrant receiving money from these government sources, particularly in such large denominations. The DRC's permanent mission to the UN told The Sentry that the funds it sent that ended up in a Sud Oil account originated from the UN's reimbursement to the Congolese government for certain expenses incurred as part of the DRC's contribution to a UN peacekeeping mission in the Central African Republic—and they were not intended for Sud Oil.[100] Banking records reviewed by The Sentry indicate that after Sud Oil obtained the $14.3 million in public funds, it sent $7.4 million from the same Sud Oil account to Selemani's DRC-based investment company Ascend Trust for real estate purchases.[101, 102]



**Documents produced in response to scrutiny contained inconsistences and discrepancies.** In April 2018, internal auditors requested justification for the central bank's $7.5 million transfer to Sud Oil in 2016, correspondence shows. Staff at BGFIBank DRC responded that the transaction represented Sud Oil's purchase of $7.5 million in exchange for 7.1 billion Congolese francs through a central bank currency auction.[103] However, The Sentry identified discrepancies in bank statements and transaction activity that raise questions about this explanation. Although Sud Oil did receive $7.5 million from the central bank, a Sud Oil bank statement produced before the April 2018 audit shows no evidence of a debit of 7.1 billion Congolese francs.[104] A bank statement the bank produced at a later date, however, shows six Congolese franc transactions on Sud Oil's account between January and April 2016, none of which were included on the statement produced before the internal audit.[105] The Sentry found no evidence of these Congolese franc transactions in any document or other bank records dated before the audit.

**The sources of funding for some transfers were misrepresented.** The Sentry identified numerous occasions where the source of funds transferred to Selemani was either misrepresented or conspicuously lacked verifiable justification. In total, Selemani and his companies received almost $3 million in US and South African bank accounts for which the wire transfers bore apparently inaccurate details.[106, 107] Selemani's US account received funds from an internal bank account held by BGFIBank DRC itself, for which the ultimate source is unknown, and records fail to justify why the transfers to Selemani were made from that internal account.[108, 109] In June 2017, Sud Oil made two identical $1.12 million transfers, labeled "investments funds." Records from BGFIBank DRC indicate that the two payments were justified with invoices for $2.33 million in construction equipment that Garvelli reportedly sold to MW Afritec,[110] a DRC-based company whose shareholders are Kabila associates.[111, 112, 113] Although BGFIBank DRC's transaction records show Sud Oil as the source of the money, the SWIFT messages and correspondence at the bank identify MW Afritec as the sender, with JPMorgan Chase serving as the correspondent bank.[114] JPMorgan Chase declined to comment on these transactions.[115]

## Vulnerabilities in the real estate sector

Despite the high risk of money laundering in real estate, the sector's due diligence requirements are often insufficient, poorly enforced, and vulnerable to exploitation.[116] In 2017, South African authorities enacted additional provisions under their Financial Intelligence Centre Act (FICA) to address vulnerabilities in the sector. These measures include penalties for noncompliance by the Estate Agency Affairs Board supervisory body, enhanced reporting requirements, and the implementation of full compliance programs using a risk-based approach for all reporting institutions, including real estate agents.[117] However, South Africa has low rates of prosecution and suspicious transaction reporting under its main AML legislation.[118, 119] Even where strong regulations exist, they must be vigorously enforced to effectively combat money laundering.

In the US, the full spectrum of anti-money laundering requirements only covers some of the actors involved in a real estate transaction. Real estate professionals can provide valuable financial intelligence on possible money laundering schemes, but they're subject to fewer government reporting requirements than financial institutions and, unlike banks, can choose whether to identify beneficial owners or report suspicious activity.[120, 121] Since 2016, the US Department of the Treasury's Financial Crimes Enforcement Network (FinCEN) has issued geographic targeting orders (GTOs), which require due diligence and reporting requirements for all-cash real estate purchases.[122, 123] However, GTOs are limited to certain US metropolitan areas, such as New York and Miami. No GTO currently covers Montgomery County, where Selemani made his real estate purchases, or the rest of the US capital region.



## Conclusion

At a time of political turmoil in the DRC and after damaging public exposures of wrongdoing at BGFIBank DRC, Selemani funneled steadily more money into real estate investments abroad. This investigation—based on leaked bank records—shows how Selemani's nine-year tenure in a senior management position at BGFIBank DRC gave the Kabila family and their allies access to a financial institution they could use to launder the proceeds of corruption. There was minimal oversight of BGFIBank DRC's activities and of the ways in which Kabila family companies embezzled funds from accounts held at the bank by public institutions, as the bank's own internal auditors found.

Once accumulated, millions flowed from BGFIBank DRC into accounts at US-based SunTrust and South Africa-based FirstRand Bank Ltd. Although tactics used internally at BGFIBank DRC obscured details offered to these foreign financial institutions and their correspondent banking partners, more thorough compliance checks by foreign banks could have potentially prevented misappropriated funds from transiting to outside jurisdictions. These compliance checks could have mitigated the heightened money laundering risks posed by a highly politically connected financial institution. When transactions were cleared by correspondent banks, BGFIBank DRC's inadequate anti-money laundering standards infected the global financial system.

What's more, weaknesses in the real estate sector make properties an ideal vehicle to stash money. The US and South African property markets are attractive, as buyers enjoy robust financial markets and strong property rights.[124] Both jurisdictions have regulations to combat money laundering, but they are insufficient and lack the enforcement necessary to dissuade laundering in the sector. As long as the real estate industry remains vulnerable to abuse, it will be used to turn stolen public funds meant for healthcare and education into lavish townhouse and mansions in cities across the globe.



# Recommendations

## United States

**Ensure that the real estate sector complies with FATF customer due diligence standards**, including by identifying the customer or beneficial owner, the purpose and intended nature of the real estate transaction, and the source of funds.[125] FinCEN should require real estate agents and other professionals involved in real estate transactions, such as lawyers, to develop anti-money laundering (AML) programs, and it should end all related exemptions under the PATRIOT Act. Such a move would add the real estate industry to the list of those required to maintain AML programs, file suspicious activity reports, and comply with other record-keeping and reporting requirements under the Bank Secrecy Act, including the identification of beneficial owner information and source of funds. AML training should be a requirement to receive a real estate agent license.

**Issue a public advisory on the money laundering risks in real estate.** FinCEN should issue an updated public advisory to US financial institutions warning of the risks for money laundering through real estate, including the involvement of PEPs highlighted in this report, building upon the agency's August 2017 advisory, "Advisory to Financial Institutions and Real Estate Firms and Professionals."[126] FinCEN should also expand and make permanent the GTO program to cover all real estate purchases, regardless of location in the US.

**Hold corrupt actors accountable.** The US Department of Justice should use its Kleptocracy Asset Recovery Initiative to investigate the source of funds used by Selemani and his relatives to buy properties in the US. Government authorities should coordinate as needed with United Nations Convention Against Corruption (UNCAC) signatories and, if appropriate, pursue legal mechanisms to forfeit and seize properties purchased with the proceeds of corruption or other illicit means. The US should investigate possible corruption and use the Global Magnitsky sanctions authority to issue sanctions and visa bans on corrupt actors.

**Investigate BGFIBank DRC.** FinCEN should investigate the activities described in this report and, if warranted, take appropriate steps pursuant to the Bank Secrecy Act (BSA) and other relevant authorities to effectively safeguard the US financial system and follow up on any continuing concerns that such an investigation may uncover. Any investigation by the US or other governments should carefully consider BGFIBank DRC's own claims, made in response to previous reporting by The Sentry, that the bank takes compliance matters "very seriously" and that it has made "continuous improvements in these areas, consistent with both its legal obligations and with industry best practices."[127]

**Address anti-money laundering and countering the financing of terrorism (AML/CFT) implementation and shortfalls.** The US government and the International Monetary Fund (IMF) should assist Congolese banks in implementing AML/CFT standards. They should urge the Congolese central bank to address gaps in AML legislation, including by enforcing the limits on large cash transactions, ensuring that banks are conducting due diligence on accounts held by individuals close to power, and tightening rules around correspondent banking. The US government should exercise greater oversight of banks, including by reviewing audits. The US Treasury's Office of Technical Assistance and the IMF should work with the DRC's Finance Ministry to address gaps in legislation and policy implementation. International partners should urge their Congolese government interlocutors to fund and empower the financial intelligence unit, and these partners should consider providing necessary technical support to the unit. The US should also provide AML technical



assistance to improve Congolese authorities' ability and capacity to tackle corruption and increase transparency.

**Strengthen qualifications for citizenship for investment programs.** The US government should update its citizenship for investment program standards to prevent money launderers and sanctions evaders from taking advantage of these programs. Congress should pass the Golden Visa Accountability Act.[128] The US should consider collaborating with other governments equipped with similar systems to improve their due diligence standards.

**Investigate correspondent banks' compliance with AML laws.** The Federal Reserve Board of Governors, FinCEN, the Office of the Comptroller of the Currency, and state authorities, as appropriate, should investigate for compliance with relevant BSA requirements the transactions described in this report that were processed by US-based banks. If warranted, authorities should take appropriate steps to address any related concerns, such as compelling the bank to take corrective action, including the submission of suspicious transaction reports to FinCEN. Given the DRC's high risk as a jurisdiction, connections to PEPs, and other red flags, banks based in the US should have been on high alert when dealing with BGFIBank DRC.

## South Africa

**Open an investigation into purchased properties.** South African authorities should investigate the source of funds used by Selemani and his relatives to buy properties. If South Africa's National Prosecuting Authority determines that the real estate was purchased with the proceeds of embezzlement or other illicit activity, those properties are subject to seizure.[129] They should coordinate as needed with UNCAC signatories and, if appropriate, pursue legal mechanisms to forfeit and seize properties purchased with the proceeds of corruption or other illicit means.

**Investigate compliance with AML laws.** South African authorities should investigate the banking activities described in this report and, if warranted, take appropriate steps to address the conduct described in this report, such as requiring the bank to implement measures to address compliance deficiencies and control weaknesses or forcing the bank to take corrective action, including submission of suspicious transaction reports to South Africa's financial intelligence unit, the Financial Intelligence Centre.

**Ensure that the real estate sector complies with FATF customer due diligence standards.** South Africa's Financial Intelligence Centre should conduct a risk assessment of the real estate sector to identify specific areas of risk on which to focus improvements to existing AML regimes. The South African government should provide appropriate training and resources to real estate professionals; consider requiring identification and record keeping of beneficial owners, applying enhanced due diligence when they are individuals close to power; and conduct tests to assess whether real estate professionals are properly implementing appropriate AML measures. AML training should be a requirement to receive a real estate agent license.

**Publish a public advisory on the money laundering risks in real estate.** The South African Financial Intelligence Centre should issue a public advisory to South African financial institutions and estate agents warning of the risks for money laundering through real estate presented in this report.



## DRC

**Improve the AML/CFT regime.** The Congolese government should enhance AML/CFT compliance by local financial institutions, including by supporting the development of a national risk assessment, a national strategy to address existing shortfalls in the AML/CFT regime, capacity building with regulators, and enhanced banking supervision.

**Strengthen the enforcement of Central Bank of Congo regulations**. The government should ensure the proper enforcement of Central Bank of Congo regulations regarding the financial sector, especially those related to anti-money laundering. As part of this effort, the Central Bank of Congo and other Congolese government authorities with a relevant mandate should thoroughly and transparently investigate the findings from this report regarding insufficient controls against money laundering at BGFIBank DRC and other identified domestic institutions.

**Empower the DRC's financial intelligence unit.** The Congolese government should empower the DRC's financial intelligence unit, the Cellule nationale des renseignements financiers (CENAREF), to conduct independent and thorough investigations of corrupt activities in support of Congolese law enforcement agencies and the national court system. In particular, the government should staff the unit with experienced professionals who are free from political influence, provide training to existing staff, and fully fund the unit. The government should also ensure that CENAREF staff have the additional resources necessary to conduct investigations, including access to information from the public and private sectors and technology suitable for accessing, analyzing, and storing such information. The DRC government should also apply to join the Egmont Group, the international consortium of financial intelligence units that promotes information sharing.

**Investigate funds stolen from state-owned enterprises.** The Congolese government should investigate any cases of misappropriation of public funds involving the central bank or the country's permanent mission to the United Nations, as outlined in this report.

**Reinforce the role of the DRC's principal audit agency in oversight of public funds**. The possible misappropriation of public funds revealed in this report highlights the need to improve external audits and transparency. The government should consider how to both reinforce the capacity and independence of Congo's supreme audit institution, the Cour des comptes, and expand the institution's access to critical documentation for tracing and verifying the movement of public money. For example, the relevant government body should evaluate whether and how the subjects of audits can provide more meaningful information about commercial banking activity to the Cour des comptes, in addition to typical audit-related documentation.

**Ensure that the public corporate registry is comprehensive, accurate, and subject to periodic external audits.** Public registries that include shareholder and beneficial ownership information can help improve corporate transparency, public oversight, and accountability. The Congolese government has created a searchable online public registry of corporate entities, and it should ensure that the registry includes all corporate entities and is accurate, updated, and available to financial institutions, law enforcement, and the general public. To ensure the accuracy and comprehensiveness of the public corporate registry, the government should charge a reliable third-party entity with periodic audits of the public corporate registry using materials in the possession of certain key ministries, such as certified corporate documentation held by the company registration office and other relevant entities within the Ministry of Justice as well as tax records held by the Ministry of Finance.



## Financial institutions

**Build leverage for reform through financial pressure.** Global correspondent banks should engage with Congolese banks and pressure them as needed to improve customer due diligence (CDD) practices. In particular, these global correspondent banks should emphasize enhanced due diligence (EDD) on PEPs, entities formally or informally associated with PEPs, and high-risk transactions. To mitigate against the possibility that major international banks cease to process any US dollar or other foreign currency transactions linked to the DRC, a potentially devastating phenomenon known as de-risking, Congolese banks should ensure that their correspondent banks are aware of all steps they are taking to improve CDD and implement EDD.

**Conduct a thorough internal investigation.** Any international financial institution engaged in correspondent banking relationships with BGFIBank DRC, or that has processed transactions involving the bank, should conduct an internal investigation—preferably led by outside counsel with expertise in money laundering and cross-border investigations—to ascertain whether the financial institution has participated in violations of law or contravened internal policies. This review should include a clear-eyed assessment of the financial institution's internal controls, specifically its AML/CFT compliance program. Specific attention should be paid to the procedures for due diligence related to correspondent banking services. Appropriate remedial action should be implemented immediately, including the filing of suspicious activity reports where required.

**Conduct enhanced due diligence, monitoring, screening, and transaction reviews**. Financial institutions should consider transactions involving Congolese individuals and entities to be high risk when undertaking a risk-based approach to AML/CFT and anti-bribery and corruption compliance. In turn, financial institutions should take measures to identify transactions and accounts with a nexus to Congolese PEPs, carry out a comprehensive assessment to identify their broader international networks, and determine measures needed to mitigate the risks involved in such accounts and customer relationships. Financial institutions should also undertake increased screening, enhanced ongoing monitoring, and transaction reviews to identify, investigate, and report potentially suspicious financial activity related to the DRC, especially with respect to international networks profiting from such activity.

**Develop best practices.** The Congolese banking association should work to develop best practices to help local banks enhance customer due diligence, including in relation to ultimate beneficial ownership and the potential for abuse of local banks by PEPs, and to help restore confidence in the Congolese banking sector.

## Real estate professionals

**Improve customer due diligence and AML measures.** Participants in the US and South African real estate sectors should take steps to protect their industries from illicit actors. Real estate agents should incorporate the red flags identified here and in other publications into their AML programs. Real estate professionals should aim to identify the beneficial owners in transactions and report suspicious activity where appropriate. Under their AML programs, they should perform enhanced due diligence for higher-risk transactions, business relationships, and customers, particularly individuals close to power.

**Publish an industry advisory.** The US National Association of Realtors and the South African Estate Agency Affairs Board should expand on previous guidance and publish advisories for its members focused on the



red flags identified in this report. They should assess the current training opportunities and resources provided to industry professionals and ensure that they are sufficient for proper implementation of all due diligence and AML guidance from regulators, including the submission of suspicious activity reports to increase the quality and quantity of reporting.

**File suspicious activity reports.** Real estate professionals who have participated in real estate transactions involving the individuals and entities described in this report should file suspicious transaction reports where appropriate with their national financial intelligence unit.



## Annex

### Selemani-linked properties in South Africa

**Property 1**

- **Description:** Adjacent apartments in Ihita Complex, located in the Johannesburg suburb Fourways
- **Owner:** Garvelli
- **Date of Purchase:** February 23, 2018
- **Original Purchase:** Francis Selemani and Aneth Lutale in 2015
- **Price:** 979,950 rand ($84,713)[130]

**Property 2**

- **Description:** Adjacent apartments in Ihita Complex, located in the Johannesburg suburb Fourways
- **Owner:** Garvelli
- **Date of Purchase:** February 23, 2018
- **Original Purchase:** Francis Selemani and Aneth Lutale in 2015
- **Price:** 979,950 rand ($84,713)[131]

**Property 3**

- **Description:** Adjacent apartments in Ihita Complex, located in the Johannesburg suburb Fourways
- **Owner:** Garvelli
- **Date of Purchase:** February 23, 2018
- **Original Purchase:** Francis Selemani and Aneth Lutale in 2015
- **Price:** 985,000 rand ($85,150)[132]

**Property 4**

- **Description:** Adjacent apartments in Ihita Complex, located in the Johannesburg suburb Fourways
- **Owner:** Garvelli
- **Date of Purchase:** February 23, 2018
- **Original Purchase:** Francis Selemani and Aneth Lutale in 2015
- **Price:** 979,950 rand ($84,713)[133]



**Property 5**

- **Description:** Apartment in Cedar Acres Estate, a luxury development in the Johannesburg suburb Fourways
- **Owner:** Garvelli
- **Date of Purchase:** February 23, 2018
- **Original Purchase:** Francis Selemani and Aneth Lutale on February 11, 2016
- **Price:** 1,680,000 rand ($145,230)[134]

**Property 6**

- **Description:** Apartment in Cedar Acres Estate, a luxury development in the Johannesburg suburb Fourways
- **Owner:** Garvelli
- **Date of Purchase:** February 23, 2018
- **Original Purchase:** Francis Selemani and Aneth Lutale on February 11, 2016
- **Price:** 1,225,000 rand ($105,897)[135]

**Property 7**

- **Description:** Apartment in the One Melville development in the Johannesburg suburb Sandton
- **Owner:** Garvelli
- **Date of Purchase:** August 10, 2016
- **Price:** 3,800,000 rand ($284,981)[136]

**Property 8**

- **Description:** Empty plot
- **Owner:** Francis Selemani and Aneth Lutale
- **Date of Purchase:** November 28, 2016
- **Price:** 899,000 rand ($64,849)[137]

**Property 9**

- **Description:** House with a pool and a tennis court in the Johannesburg suburb Bryanston
- **Owner:** Garvelli
- **Date of Purchase:** April 25, 2017
- **Price:** 4,500,000 rand ($344,632)[138]



**Property 10**

- **Description:** Free-standing five-bedroom house on a 0.9-hectare (two-acre) plot of land
- **Owner:** Garvelli
- **Date of Purchase:** June 17, 2017
- **Price:** 5,000,000 rand ($388,722)[139]

**Property 11**

- **Description:** Seven-building complex north of Johannesburg
- **Owner:** Primal Trust
- **Date of Purchase:** February 23, 2018
- **Original Purchase:** Francis Selemani and Aneth Lutale in 2015
- **Price:** 5,500,000 rand ($475,457)[140]

**Property 12**

- **Description:** Portion of The Avenues on Broadacres, a property development in the Johannesburg suburb Fourways
- **Owner:** Garvelli
- **Date of Purchase:** February 23, 2018
- **Price:** 2,135,000 rand ($184,564)[141]

**Property 13**

- **Description:** Portion of The Avenues on Broadacres, a property development in the Johannesburg suburb Fourways
- **Owner:** Garvelli
- **Date of Purchase:** February 23, 2018
- **Price:** 1,985,000 rand ($171,597)[142]

**Property 14**

- **Description:** Free-standing 1,021 square-meter (11,000 square-foot) house in the Dainfern golf and residential estate outside Johannesburg
- **Owner:** Garvelli
- **Date of Purchase:** April 4, 2019
- **Price:** 7,500,000 rand ($530,185)[143]



**Property 15**

- **Description:** Free-standing three-bedroom house with pool in the Dainfern golf and residential estate outside Johannesburg
- **Owner:** Garvelli
- **Date of Purchase:** June 9, 2020
- **Price:** 5,500,000 rand ($329,568)[144]

**Property 16**

- **Description:** Free-standing 913 square-meter (9,800 square-foot) house with pool in the Dainfern golf and residential estate outside Johannesburg
- **Owner:** Garvelli
- **Date of Purchase:** September 19, 2020
- **Price:** 4,900,000 rand ($300,370)[145]

## Selemani-linked properties in the United States

**Property 17**

- **Description:** Four-bedroom rowhouse in the Washington suburb Rockville
- **Owner:** Balanne Family Living Trust
- **Date of Purchase:** April 17, 2018
- **Original Purchase:** Francis Selemani and Aneth Lutale on August 10, 2015
- **Price:** $670,000[146]

**Property 18**

- **Description:** Three-bedroom, four-floor luxury townhouse in the Washington suburb Bethesda; new construction
- **Owner:** Balanne Family Living Trust
- **Date of Purchase:** May 15, 2018
- **Price:** $1,224,999[147]

**Property 19**

- **Description:** Three-bedroom luxury townhouse in the Washington suburb Bethesda; new construction
- **Owner:** Balanne Family Living Trust



- **Date of Purchase:** December 18, 2018
- **Price:** $884,720[148]

**Property 20**

- **Description:** Three-bedroom luxury townhouse in the Washington suburb Bethesda; new construction
- **Owner:** Balanne Family Living Trust
- **Date of Purchase:** December 18, 2018
- **Price:** $1,377,237[149]



# Endnotes

1   This assessment is based on The Sentry's review of property records, bank account statements, and corporate filings.

2   Former BGFIBank DRC credit chief Jean-Jacques Lumumba exposed in 2016 his onetime employer's role in questionable transactions worth millions of dollars with companies known to have close ties to the Kabila family. See:

Platform to Protect Whistleblowers in Africa, "Bank Revelations That Weaken DRC's President's Hold on Power," available at: https://www.pplaaf.org/whistleblowers/jean-jacques-lumumba.html (last accessed January 2021)

3   Media reports and investigations by The Sentry and other organizations revealed the bank's involvement in numerous questionable transactions, including those indicative of money laundering, sanctions violations, and misappropriation of public funds. See:

Xavier Counasse and Colette Braeckman, "Corruption au Congo : les preuves qui accablent le régime Kabila" (Corruption in Congo: Evidence Overwhelms Kabila Regime), Le Soir, October 29, 2016, available at: http://plus.lesoir.be/66290/article/2016-10-29/corruption-au-congo-les-preuves-qui-accablent-le-regime-kabila

Michael Kavanagh, Thomas Wilson, and Franz Wild, "Congo Election Body Said to Pay Millions to Kabila-Tied Bank," Bloomberg, November 1, 2016, available at: https://www.bloomberg.com/news/articles/2016-11-01/congo-election-body-said-to-pay-millions-to-kabila-linked-bank

Platform to Protect Whistleblowers in Africa, "Bank Revelations That Weaken DRC's President's Hold on Power," available at: https://www.pplaaf.org/whistleblowers/jean-jacques-lumumba.html (last accessed January 2021).

The Sentry, "The Terrorists' Treasury: How a Bank Linked to Congo's President Enabled Hezbollah Financiers to Bust U.S. Sanctions," October 2017, available at: https://thesentry.org/reports/terrorists-treasury-congo/

The Sentry, "Covert Capital: The Kabila Family's Secret Investment Bank," May 2019, available at: https://thesentry.org/reports/covert-capital/

4   A 2018 internal audit of "related parties"—companies owned by bank executives, board members, or their families that held accounts at BGFIBank DRC—found the bank's conduct to be "unacceptable," due, among other things, to a "lack of integrity" in the disclosure of conflicts of interest and compliance with the auditing of related party transactions. Related parties identified by the audit included Sud Oil and Ascend Trust, mentioned in this report. The audit also found that the bank failed to observe central bank regulations governing board compensation, shareholder meetings, and prudential ratios, as well as anti-money laundering (AML) regulations, conflict of interest management, internal controls, corporate governance, and risk management. In addition, the audit report stated that money laundering policies and procedures were "unsatisfactory" overall. The report also found that the board had only a limited AML policy in place, transaction monitoring was minimal, know your customer due diligence files and operating procedures were outdated, and AML training for staff was ineffective. The report noted that the managing director—Selemani—and the board failed to monitor compliance oversight.

5   This analysis is based largely on The Sentry's review of a range of bank documents and transaction records related to Sud Oil, Ascend Trust, and Selemani himself.

6   Congo Research Group, "The President's Bank: Sud Oil, Kwanza Capital and the Kabila Family," November 19, 2021.

7   When Selemani was promoted to managing director of BGFIBank DRC, his 2012 contract indicated a monthly salary of $13,700, with an additional $9,010 monthly in covered expenses such as housing. His stated total annual compensation, including $86,000 in annual covered expenses, was $358,520. Between 2012 and 2018, while serving in that post, he thus would have received a total of $2.2 million in gross pay if no changes were made to his compensation after the initial contract. However, The Sentry's review of banking documents indicates that Selemani's accounts received approximately $4.9 million from BGFIBank DRC over that same time period, amounting to 74% of the $6.6 million value of the properties purchased between 2015 and 2018.

8   This assessment is based on The Sentry's review of property records, bank account statements, and corporate filings.

9   The Sentry, "Covert Capital: The Kabila Family's Secret Investment Bank," May 2019, available at: https://thesentry.org/reports/covert-capital/

10  Ibid.



11    While The Sentry previously reported that Gloria Mteyu and Aneth Lutale first re-registered Sud Oil in early 2014, documents in the leak reviewed by The Sentry indicate that they actually became shareholders in the company in late 2013. Mteyu and Lutale then re-registered the company in early 2014 as a function of the DRC's implementation of a series of business norms and standards laid out in a treaty to which the country became a signatory in 2012.

12    See note 9.

13    The website of the Congolese corporate registry lists Société de génie et d'exploitation minière et pétrolière (SOGEMIP) as a current shareholder.

Registre du Commerce et du Crédit Mobilier, "Sud Oil," available at: https://rccm.cd/rccm/index.html (last accessed March 2021).

14    Franz Wild, Michael Kavanagh, and Thomas Wilson, "Congo Election Body Said to Pay Millions to Kabila-Tied Bank," Bloomberg, November 1, 2016, available at https://www.bloomberg.com/news/articles/2016-11-01/congo-electionbodysaid-to-pay-millions-to-kabila-linked-bank

15    See note 9.

16    According to its corporate documents, Sud Oil describes its business activities as the exploration and production of hydrocarbons, the distribution and commercialization of petroleum products, the production of petroleum products, engineering consulting in the domain of hydrocarbons, the transport and storage of petroleum products, and the commercialization and refinement of petrol. See:

Ministère de la Justice, Registre du commerce et du crédit mobilier (Democratic Republic of Congo Registry of Commerce and Securities), "Statuts" (Articles of Incorporation), Sud Oil, March 28, 2014.

17    See note 9.

18    See note 9.

19    See note 6.

20    See note 6.

21    For further analysis of Sud Oil's activities and accounts, see note 9.

22    BGFIBank DRC, "Memo sur les opérations des sociétés clientes parties liées de la banque" (Memo on Transactions by Related Party Bank Clients), June 26, 2018.

23    This analysis is based largely on The Sentry's review of a range of bank documents and transaction records related to Sud Oil, Ascend Trust, and Selemani himself.

24    See note 9.

25    The Sentry reviewed bank statements to trace the source of the $7.4 million Sud Oil sent to Ascend Trust. The funds were transferred from a Sud Oil account that only held approximately $40,000 prior to the two credits from official sources: the central bank and the DRC's permanent mission to the UN. The DRC permanent mission to the UN told The Sentry the funds consisted of a reimbursement by the UN to the DRC government for certain expenses linked to a peacekeeping mission in the neighboring Central African Republic, which is reinforced by US court filings on the same transfer. These funds were not intended for Sud Oil, but rather were diverted to the company, according to the permanent mission. Sud Oil then moved the $7.5 million into a short-term deposit ("dépôt à terme"). The Sentry then identified a series of highly suspicious, high-denomination transactions during a two-month period after Sud Oil received the public funds. These transactions appear to have canceled one another out, meaning that the balance on the account still consisted largely of money originating from public sources. Sud Oil then requested to withdraw the $7.5 million short-term deposit prior to its maturity, according to correspondence reviewed by The Sentry. The same day the funds were credited to Sud Oil's account, the company transferred $7.4 million to Ascend Trust, approximately 99% of the original investment. See:

BGFIBank DRC, Sud Oil "Immo," US dollar account ending in 14.

Response to The Sentry from the DRC Permanent Mission to the United Nations, November 9, 2021.

FG Hemisphere Associates, LLC vs. Democratic Republic of Congo and Société nationale d'électricité, United States District Court for the Southern District of New York, 1:19-mc-00232, 2021.

26    BGFIBank DRC, Ascend Trust,  US dollar account ending in 11.



27    Selemani and Lutale were the shareholders of Ascend Trust as of March 2015, according to incorporation documents reviewed by The Sentry. Board meeting minutes indicate that Lutale became the sole shareholder in January 2018. The Congolese corporate registry confirmed Ascend Trust's registration was canceled upon its dissolution, according to corporate documents dated March 7, 2019. See:

Ministère de la Justice, Registre du commerce et du crédit mobilier (Democratic Republic of Congo Registry of Commerce and Securities), "Statuts" (Articles of Incorporation), Ascend Trust, March 6, 2015.

Ministère de la Justice, Registre du commerce et du crédit mobilier (Democratic Republic of Congo Registry of Commerce and Securities), Ascend Trust, "Assemblée générale extraordinaire du 10 janvier 2018, Procès verbal" (Minutes of January 10, 2018 Shareholder Meeting), January 10, 2018.

Ministère de la Justice, Registre du commerce et du crédit mobilier (Democratic Republic of Congo Registry of Commerce and Securities), Ascend Trust, "Dépôt au greffe de procès verbal de la décision de l'associée unique extraordinaire du 26/09/2018" (Minutes of September 26, 2018 Decision by the Sole Shareholder), March 7, 2019.

28    As indicated in this report, Selemani and his wife purchased properties after receiving misappropriated public funds, and in particular, approximately $3 million that transited the accounts of the company Sud Oil, for which Selemani's wife was the majority owner with the remainder held by Kabila family member Gloria Mteyu. Mteyu also held 40% of BGFIBank DRC's shares at that time. Some of the public money that transited Sud Oil's account ended up in a DRC-based company owned and controlled by Selemani and his wife, Ascend Trust. The Sentry used banking documents to track the ultimate destination of the $9.5 million total that Sud Oil transferred to Ascend Trust to ascertain how those funds were ultimately used. From this money, Selemani received at least $100,000 in his account in South Africa shortly after his company purchased a property there. Selemani and his wife also withdrew $33,366.24. Of the money Sud Oil sent to Ascend Trust, more than $3 million was ultimately paid to lawyers or legal services companies. More than $3.6 million ended up with Horizon Congo, a company founded by Sud Oil manager David Ezekiel, and transaction records indicate this was to pay invoices for excavators. Auditors at BGFIBank DRC's parent company in Gabon raised questions about these transfers to Horizon Congo. BGFIBank DRC's Kolwezi branch rented its building from Horizon Congo beginning in 2018 at a rate of around $100,000 a year. In addition, more than $200,000 of the Ascend Trust money ended up with an individual listed as the African customer relations representative of a US real estate group. In August 2017, Ascend Trust sent half a million dollars to an individual whose company operates in the DRC, South Africa, the United Arab Emirates, and the US. In an agreement reviewed by The Sentry dated the day before the transfer, the individual sold a property in the Congolese city of Lubumbashi for the same amount. See:

BGFIBank DRC, Sud Oil "Immo," US dollar account ending in 14.

BGFIBank DRC, Ascend Trust, US dollar account ending in 11.

BGFIBank DRC, "Memo sur le compte Horizon Congo," (Memo on the Horizon Congo Account), April 3, 2018.

29    After it moved the funds transferred by Sud Oil into other businesses and ventures, Ascend Trust was liquidated in February 2019, according to corporate documents reviewed by The Sentry.

Ministère de la Justice, Registre du commerce et du crédit mobilier (Democratic Republic of Congo Registry of Commerce and Securities), Ascend Trust, "Dépôt au greffe de procès verbal de la décision de l'associée unique extraordinaire du 26/09/2018" (Minutes of September 26, 2018 Decision by the Sole Shareholder), March 7, 2019.

30    This analysis is based largely on The Sentry's review of a range of bank documents and transaction records related to Sud Oil, Ascend Trust, and Selemani himself.

31    SWIFT messages dated May 28, 2015; June 3, 2015; June 16, 2015; and August 4, 2015.

32    This analysis is based largely on The Sentry's review of a range of bank documents and transaction records related to Sud Oil, MW Afritec, internal accounts at the bank, and Selemani himself.

33    Maryland State Archives, "Deed," Book 50883, pp. 418-423, available at: https://mdlandrec.net/main/dsp_search.cfm (last accessed April 2021).

34    The transactions were labeled "acquisition immo," an abbreviation for "property purchase," and "frais amenagement immobilier," a reference to property development. See:

SWIFT messsages dated May 28, 2015; June 3, 2015; June 16, 2015; and August 4, 2015.

35    According to a 2011 audit report, this internal account held by BGFIBank DRC stored large amounts of money before operations such as import and currency exchange control fees were settled on client accounts. The report stated that



the internal account presented a number of compliance risks, including to efforts to properly monitor client account operations.

36    BGFIBank DRC, "OAR/Operations," US dollar account ending in 81.

37    BGFIBank Group, "Rapport de mission d'inspection" (Audit Report), May 11, 2011.

38    The Sentry determined that these funds came from the internal account held by BGFIBank DRC and not Selemani's personal account by comparing SWIFT messages to transaction records for both the internal account and Selemani's account. The internal account transferred the funds to a BGFIBank DRC correspondent account for the indicated purpose of "FRAIS CORRPMT TRAITE," an abbreviation for correspondent fees processed.

39    SWIFT messages dated May 28, 2015; June 3, 2015; June 16, 2015; and August 4, 2015.

40    Response to the Congo Hold-up consortium from Commerzbank, November 5, 2021.

41    BGFIBank DRC, "OAR/Operations," US dollar account ending in 81.

42    Invoices from Garvelli, May 24, 2017.

43    Khadija Sharife, John Grobler, and Camille Rios, "DRC Company Promised Cheap Food, Delivers Stolen Money," Organized Crime and Corruption Reporting Project, November 8, 2017, available at: https://www.occrp.org/en/investigations/7234-drc-company-promised-cheap-food-delivers-stolen-money

44    BGFIBank DRC, Sud Oil, US dollar account ending in 12.

45    Pretoria Deeds Office, "T84680/2017," WinDeed, available at: https://search.windeed.co.za/ (last accessed April 2021).

46    Pretoria Deeds Office, "ST63329/2018," WinDeed, available at: https://search.windeed.co.za/ (last accessed April 2021).

47    Pretoria Deeds Office, "ST37095/2018," WinDeed, available at: https://search.windeed.co.za/ (last accessed April 2021).

48    Pretoria Deeds Office, "ST56465/2018," WinDeed, available at: https://search.windeed.co.za/ (last accessed April 2021).

49    Pretoria Deeds Office, "ST63324/2018," WinDeed, available at: https://search.windeed.co.za/ (last accessed April 2021).

50    Pretoria Deeds Office, "ST23393/2019," WinDeed, available at: https://search.windeed.co.za/ (last accessed April 2021).

51    Pretoria Deeds Office, "ST63753/2018," WinDeed, available at: https://search.windeed.co.za/ (last accessed April 2021).

52    In 2015 and 2016, Selemani purchased four apartments in a complex for approximately 980,000 rand ($84,000) each, two apartments in another complex for less than 1.7 million rand ($145,000) each, and another property for 900,000 rand ($65,000). See notes 46 through 51 and:

      Pretoria Deeds Office, "T101336/2016/2018," WinDeed, available at: https://search.windeed.co.za/ (last accessed April 2021).

53    The Financial Action Task Force recommends that real estate agents take a risk-based approach to prevent money laundering through real estate. See:

      Financial Action Task Force, "RBA Guidance for Real Estate Agents," June 17, 2008, available at: https://www.fatf-gafi.org/media/fatf/documents/reports/RBA%20Guidance%20for%20Real%20Estate%20Agents.pdf

54    Pretoria Deeds Office, "T4785/2018," WinDeed, available at: https://search.windeed.co.za/ (last accessed April 2021).

55    Pretoria Deeds Office, "T37471/2019," WinDeed, available at: https://search.windeed.co.za/ (last accessed April 2021).

56    Pretoria Deeds Office, "T32990/2020," WinDeed, available at: https://search.windeed.co.za/ (last accessed April 2021).

57    Pretoria Deeds Office, "T768/2021," WinDeed, available at: https://search.windeed.co.za/ (last accessed April 2021).

58    Tahir Desai, "The 10 Most Expensive Estates in Gauteng," Private Property, May 8, 2018, available at: https://www.privateproperty.co.za/advice/news/articles/the-10-most-expensive-estates-in-gauteng/6352

59    PoundSterling LIVE, "Historical Rates for the ZAR/USD Currency Conversion on 08 May 2018 (08/05/2018)," available at: https://www.poundsterlinglive.com/best-exchange-rates/south-african-rand-to-us-dollar-exchange-rate-on-2018-05-08



60      Dainfern, homepage, available at: https://dainfern.co.za/ (last accessed April 2021).

61      All four of Selemani's US properties and one of his South African properties are owned through trusts. See:

        Maryland State Archives, "Deed," Book 55925, pp. 328-331, available at: https://mdlandrec.net/main/dsp_search.cfm (last accessed April 2021).

        Maryland State Archives, "Deed," Book 56112, pp. 124-131, available at: https://mdlandrec.net/main/dsp_search.cfm (last accessed April 2021).

        Maryland State Archives, "Deed," Book 57085, pp. 367-374, available at: https://mdlandrec.net/main/dsp_search.cfm (last accessed April 2021).

        Maryland State Archives, "Deed," Book 56130, pp. 1-8, available at: https://mdlandrec.net/main/dsp_search.cfm (last accessed April 2021).

        Pretoria Deeds Office, "T4785/2018," WinDeed, available at: https://search.windeed.co.za/ (last accessed April 2021).

62      Maryland State Archives, "Deed," Book 56112, pp. 124-131, available at: https://mdlandrec.net/main/dsp_search.cfm (last accessed April 2021).

63      Maryland State Archives, "Deed," Book 55925, pp. 328-331, available at: https://mdlandrec.net/main/dsp_search.cfm (last accessed April 2021).

64      BGFIBank DRC, Francis Selemani, US dollar account ending in 13.

65      When Selemani was promoted to managing director of BGFIBank DRC, his 2012 contract indicated a monthly salary of $13,700, with an additional $9,010 monthly in covered expenses such as housing. His stated total annual compensation, including $86,000 in annual covered expenses, was $358,520. Between 2012 and 2018, while serving in that post, he thus would have received a total of $2.2 million in gross pay if his compensation remained consistent with the 2012 contract.

66      Maryland State Archives, "Deed," Book 56130, pp. 1-8, available at: https://mdlandrec.net/main/dsp_search.cfm (last accessed April 2021).

67      Jeff Clabaugh, "DC Area Now the Nation's 4th Most Valuable House Metro," WTOP News, January 28, 2021, available at: https://wtop.com/business-finance/2021/01/dc-area-now-the-nations-4th-most-valuable-housing-metro

68      Kathy Orton, "The Washington Area Housing Market in 2019: It Was on Strong Footing but Uncertainty Lies Ahead," The Washington Post, March 26, 2020, available at: https://www.washingtonpost.com/realestate/washington-area-housing-market-in-2019-it-was-on-strong-footing-but-uncertainty-looms/2020/03/26/6fb4d020-6d1e-11ea-b148-e4ce3fbd85b5_story.html

69      Property description provided by Bright MLS, a multiple listing service servicing Maryland.

70      See note 62, pp. 124-131.

71      See note 66, pp. 1-8.

72      Address data, Nexis, available at: www.nexis.com (last accessed April 2021).

73      Financial Action Task Force, "Money Laundering & Terrorist Financing Through the Real Estate Sector," June 29, 2007, available at: https://www.fatf-gafi.org/media/fatf/documents/reports/ML%20and%20TF%20through%20the%20Real%20Estate%20Sector.pdf

74      Although trusts often enjoy legal protections from seizure that may complicate the repatriation of any misappropriated public funds, it is unclear whether Primal Trust and Balanne Family Living Trust would enjoy these same protections See:

        Emma Forbes, "10 Things to Know About South African Trusts," Financial Institutions Legal Snapshot, December 7, 2015, available at: https://www.financialinstitutionslegalsnapshot.com/2015/12/10-things-to-know-about-south-african-trusts/

        Belle Wong, "Can a Living Trust Protect a Home From a Lawsuit?" LegalZoom, available at: https://info.legalzoom.com/article/can-living-trust-protect-home-lawsuit (last accessed May 2021).

75      Selemani sought out these opportunities despite the fact that both the DRC and Tanzania, where he and his wife both apparently hold citizenship, generally do not allow dual citizenship. There are two exemptions to the dual citizenship regulation in Tanzania: children are allowed dual nationality until they turn 21 years old, at which point they must



revoke one of their nationalities; citizens who involuntarily acquire their spouse's citizenship may retain their Tanzanian citizenship. See:

Bronwen Manby, "Citizenship Law in Africa: A Comparative Study," Open Society Foundation, January 2016, available at: https://www.opensocietyfoundations.org/uploads/d5d1d086-1a0d-4088-b679-003e09e9c125/citizenship-law-africa-third-edition-20160129.pdf

76      BGFIBank DRC, Francis Selemani, US dollar account ending in 11.

77      Grenada Citizenship by Investment, "The Benefits of Citizenship in Grenada," Government of Grenada, archived at: https://web.archive.org/web/20200620104039/https://www.cbi.gov.gd/citizenship-by-investment-infographic/ (last archived June 20, 2020).

78      Citizenship by investment programs and the sale of diplomatic passports in the Caribbean have reportedly been used to secretly fund electoral campaigns, including in Grenada. Some governments have expressed concerns that these investor passports could be used for illicit financial activity. See:

Al-Jazeera, "Exclusive: Caribbean Officials Linked to Diplomatic Passport Sales," November 27, 2019, available at: https://www.aljazeera.com/news/2019/11/27/exclusive-caribbean-officials-linked-to-diplomatic-passport

Juliette Garside and Hilary Osborne, "The Passport King Who Markets Citizenship for Cash," The Guardian, October 16, 2018, available at: https://www.theguardian.com/world/2018/oct/16/the-passport-king-who-markets-citizenship-for-cash

Sophie Hares, "Are the Caribbean's Wealthy New Citizens a Lifeline or a Liability?" Reuters, July 19, 2018, available at: https://www.reuters.com/article/us-islands-caribbean-investment-citizens/are-the-caribbeans-wealthy-new-citizens-a-lifeline-or-a-liability-idUSKBN1K928J

Congressional Research Service, "The Changing Landscape of Immigrant Investment Programs," October 25, 2019, available at: https://crsreports.congress.gov/product/pdf/IF/IF11344/3

Jurgen Balzan, "Henley and Partners Involved in Grenada Diplomatic Passports Scandal," The Shift, December 20, 2017, available at: https://theshiftnews.com/2017/12/20/henley-and-partners-involved-in-grenada-diplomatic-passports-scandal/

79      Arton Capital, "Homepage," available at: https://www.artoncapital.com/ (last accessed December 2020).

80      BGFIBank DRC, Francis Selemani, euro account ending in 15.

81      PoundSterling LIVE, "Historical Rates for the EUR/USD Currency Conversion on 28 February 2018 (28/02/2018)," available at: https://www.poundsterlinglive.com/best-exchange-rates/euro-to-us-dollar-exchange-rate-on-2018-02-28

82      The transaction was labeled "EB-5 IMMIGRANT INVESTOR PROGRAM," a reference to a US investor visa. Although there are no publicly available lists of EB-5 visa recipients, US government statistics indicate that an unnamed Tanzanian citizen received one in 2018, followed by a DRC citizen in 2019. Selemani and his wife both hold Tanzanian citizenship. See:

Bureau of Consular Affairs, "Report of the Visa Office 2018 Part 3 (Employment Fifth and Totals, Grand Totals)," US Department of State, available at: https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/annual-reports/report-of-the-visa-office-2018.html (last accessed February 2021).

Bureau of Consular Affairs, "Report of the Visa Office 2019 Part 4 (Employment 5th, Grand Total)," US Department of State, available at: https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/annual-reports/report-of-the-visa-office-2019.html (last accessed February 2021).

83      In recent years, the Securities and Exchange Commission and federal prosecutors have charged individuals involved with the EB-5 investor visa with fraud in over a dozen cases. See:

Konrad Putzier, "Covid-19 Worsens Troubles in an Investor Visa Program," The Wall Street Journal, June 22, 2021, available at: https://www.wsj.com/articles/covid-19-worsens-troubles-in-an-investor-visa-program-11624363201

US Immigration and Customs Enforcement, "US Files 9 Lawsuits Seeking Forfeiture of Properties Worth Over $30 Million Allegedly Bought With Proceeds of EB-5 Visa Fraud Scheme," May 25, 2017, available at: https://www.ice.gov/news/releases/us-files-9-lawsuits-seeking-forfeiture-properties-worth-over-30-million-allegedly

84      See note 73.



85    FinCEN indicates that "the misuse of shell companies to launder money is a systemic concern for law enforcement and regulatory agencies, but it is of particular concern in the 'all-cash' segment of the real estate market, which currently has fewer AML protections." See:

Financial Crimes Enforcement Network, "Advisory to Financial Institutions and Real Estate Firms and Professionals," August 22, 2017, available at: https://www.fincen.gov/sites/default/files/advisory/2017-08-22/Risk%20in%20Real%20 Estate%20Advisory_FINAL%20508%20Tuesday%20%28002%29.pdf

86    This assessment is based on The Sentry's review of property records, bank account statements, and corporate filings.

87    According to Transparency International's 2020 Corruption Perceptions Index, the DRC ranked 170 out of 179 countries. See:

Transparency International, "Corruption Perceptions Index," available at: https://www.transparency.org/en/cpi/2020/ index/cod (last accessed November 2021).

88    For example, in tax and deed records for one of the properties, the address for Balanne Family Living Trust and its trustee Aneth Lutale are listed at a Germantown, Maryland, property owned by an apparent family member of Lutale. South African property deeds do not contain the address of the purchaser, but corporate records for Garvelli list Johannesburg addresses. See:

Maryland Department of Assessments and Taxation, available at: https://sdat.dat.maryland.gov/RealProperty/Pages/ default.aspx (last accessed April 2021).

South Africa Companies and Intellectual Property Commission, "Garvelli," available at: https://eservices.cipc.co.za/ Search.aspx (last accessed March 2021).

89    Geographical distance between the buyer and the property in question is listed as a money laundering risk factor in regulators' guidance to real estate professionals See:

National Association of Realtors, "Anti-Money Laundering Guidelines for Real Estate Professionals," November 15, 2012, available at: https://www.nar.realtor/political-advocacy/anti-money-laundering-guidelines-for-real-estate-professionals

Estate Agency Affairs Board, "Implementation of the Financial Intelligence Centre Act, 38 of 2001 (The FIC Act), by the Estate Agency Sector," November 19, 2018, available at: https://www.eaab.org.za/article/implementation_of_the_ financial_intelligence_centre_act_38_of_2001_the_fic_act_by_the_estate_agency_sector

90    Financial Action Task Force, "FATF Guidance: Politically Exposed Persons (Recommendations 12 and 22)," 2013, available at: https://www.fatf-gafi.org/media/fatf/documents/recommendations/Guidance-PEP-Rec12-22.pdf

91    Ibid.

92    See note 3.

93    Financial Action Task Force, "Laundering the Proceeds of Corruption," July 2011, available at: http://www.fatf-gafi.org/ media/fatf/documents/reports/Laundering%20the%20Proceeds%20of%20Corruption.pdf

94    See note 3.

95    See note 90.

96    BGFIBank DRC, Sud Oil "Immo," US dollar account ending in 14.

97    Response to The Sentry from the DRC Permanent Mission to the United Nations, November 9, 2021.

98    FG Hemisphere Associates, LLC vs. Democratic Republic of Congo and Société nationale d'életricité, United States District Court for the Southern District of New York, 1:19-mc-00232, 2021.

99    The $7.5 million was placed in a short-term low-yield investment, banking documents show. On July 27, 2016, Sud Oil asked to terminate the short-term investment that was supposed to mature the following August. On the same day that the funds were credited back to Sud Oil's account, August 2, 2016, Sud Oil transferred nearly the same amount, $7.4 million, to Ascend Trust.

BGFIBank DRC, Sud Oil "Immo," US dollar account ending in 14.

100   Response to The Sentry from the DRC Permanent Mission to the United Nations, November 9, 2021.

101   BGFIBank DRC, Sud Oil "Immo," US dollar account ending in 14.

102   BGFIBank DRC, Ascend Trust, US dollar account ending in 11.



103  Letter from the Congolese central bank to BGFIBank DRC, April 12, 2016.

104  BGFIBank DRC, Sud Oil, Congolese franc account ending in 15.

105  BGFIBank DRC, Sud Oil, Congolese franc account ending in 15.

106  SWIFT messages dated May 28, 2015; June 3, 2015; June 16, 2015; and August 4, 2015.

107  This analysis is based largely on The Sentry's review of a range of bank documents and transaction records related to Sud Oil, MW Afritec, internal accounts at the bank, and Selemani himself.

108  BGFIBank DRC, "OAR/Operations," US dollar account ending in 81.

109  BGFIBank DRC, Francis Selemani, US dollar account ending in 11.

110  Invoices from Garvelli, May 24, 2017.

111  See note 43.

112  MW Afritec, "MW Afritec," available at: http://www.mwafritec.com/ (last accessed March 2020).

113  Registre du Commerce et du Crédit Mobilier, "MW Afritec," available at: https://rccm.cd/rccm/index.html (last accessed March 2021).

114  BGFIBank DRC, Sud Oil, US dollar account ending in 12.

115  Response to The Sentry from JPMorgan Chase, November 8, 2021.

116  Accuity, "Money Laundering and Real Estate: Why the Real Estate Sector Should Prepare for Regulation," April 2018, available at: https://accuity.com/resources/money-laundering-and-real-estate-why-the-real-estate-sector-should-prepare-for-regulation/

117  Estate Agency Affairs Board, "Study Materials on the FIC Act," November 19, 2018, available at: https://www.eaab.org.za/article/implementation_of_the_financial_intelligence_centre_act_38_of_2001_the_fic_act_by_the_estate_agency_sector

118  Jeffrey R. Boles, "Anti-Money Laundering Initiatives for the South African Real Estate Market," Journal of Comparative Urban Law and Policy, 1, 2017, available at: https://readingroom.law.gsu.edu/cgi/viewcontent.cgi?article=1013&context=jculp

119  South Africa Financial Intelligence Center, "Typologies and Case Studies," March 2019, available at: https://www.fic.gov.za/Documents/TYPOLOGIES%20&%20CASE%20STUDIES-%20MARCH%202019.pdf

120  National Association of Realtors, "Anti-Money Laundering Guidelines for Real Estate Professionals," November 15, 2012, available at: https://www.nar.realtor/political-advocacy/anti-money-laundering-guidelines-for-real-estate-professionals

121  US authorities have increasingly implemented measures to halt money laundering through real estate amid heightened attention on the issue. However, a 2017 report by Transparency International found that the US still lacked tests to assess whether real estate agents were aware of their anti-money laundering obligations, there was weak supervision of the real estate sector, and real estate professionals rarely faced sanctions. See:

Transparency International, "Doors Wide Open," 2017, available at: https://images.transparencycdn.org/images/2017_DoorsWideOpen_EN.pdf

Financial Crimes Enforcement Network, "Advisory to Financial Institutions and Real Estate Firms and Professionals," August 22, 2017, available at: https://www.fincen.gov/sites/default/files/advisory/2017-08-22/Risk%20in%20Real%20Estate%20Advisory_FINAL%20508%20Tuesday%20%28002%29.pdf

122  Financial Crimes Enforcement Network, "Geographic Targeting Order," November 4, 2020, available at: https://www.fincen.gov/sites/default/files/shared/508_Real%20Estate%20GTO%20Order%20FINAL%20GENERIC%2011.4.2020.pdf

123  US Department of the Treasury, "National Strategy for Combating Terrorist and Other Illicit Financing," February 2020, available at: https://home.treasury.gov/system/files/136/National-Strategy-to-Counter-Illicit-Financev2.pdf

124  Gregory Mthembu-Salter, "Money Laundering in the South African Real Estate Market Today," Money Laundering Experiences, A Survey, June 2006, available at: https://issafrica.org/chapter-2-money-laundering-in-the-south-african-real-estate-market-today



125    Financial Action Task Force, "The FATF Recommendations," June 2021, available at: https://www.fatf-gafi.org/media/fatf/documents/recommendations/pdfs/fatf%20recommendations%202012.pdf

126    See note 85.

127    See note 9.

128    Maura Gillespie, "Kinzinger, Malinowski Lead Effort on Golden Visa Accountability," June 25, 2021, available at: https://kinzinger.house.gov/news/documentsingle.aspx?DocumentID=402759

129    Republic of South Africa, Prevention of Organised Crime Act, 1998, December 4, 1998, Government Gazette, 402.19553, see: https://www.gov.za/sites/default/files/gcis_document/201409/a121-98.pdf

130    See note 46.

131    See note 47.

132    See note 48.

133    See note 49.

134    See note 50.

135    See note 51.

136    Pretoria Deeds Office, "ST39174/2018," WinDeed, available at: https://search.windeed.co.za/ (last accessed April 2021).

137    Pretoria Deeds Office, "T101336/2016/2018," WinDeed, available at: https://search.windeed.co.za/ (last accessed April 2021).

138    Pretoria Deeds Office, "T52392/2017," WinDeed, available at: https://search.windeed.co.za/ (last accessed April 2021).

139    See note 45.

140    See note 54.

141    Pretoria Deeds Office, "T3476/2019," WinDeed, available at: https://search.windeed.co.za/ (last accessed April 2021).

142    Pretoria Deeds Office, "T39764/2019," WinDeed, available at: https://search.windeed.co.za/ (last accessed April 2021).

143    See note 55.

144    See note 56.

145    See note 57.

146    See note 63, pp. 328-331.

147    See note 62, pp. 124-131.

148    Maryland State Archives, "Deed," Book 57085, pp. 367-374, available at: https://mdlandrec.net/main/dsp_search.cfm (last accessed April 2021).

149    See note 66, pp. 1-8.

